Anita J. HORNEY, Plaintiff

v.

WESTFIELD GAGE CO.,
et al., Defendants

No. CIV.A.99–30175–KPN.

United States District Court,
D. Massachusetts.

June 20, 2002.

---

Donna M. Cuipylo, W. Roxbury, MA, for Anita J. Horney, Plaintiff.

Thomas E. Shirley, Karen D. Lane, Choate, Hall & Stewart, Boston, MA, Timothy J. Ryan, Theodore F. Glockner, Crevier & Ryan, LLP, Springfield, MA, for Westfield Gage Co., defendant.

Mark E. Draper, Annino, Draper & Moore, P.C., Springfield, MA, Timothy J. Ryan, Theodore F. Glockner, Crevier & Ryan, LLP, Springfield, MA, for Edward Woodis, Defendant.

*MEMORANDUM AND ORDER RE-GARDING POST-JUDGMENT MOTIONS (Docket Nos. 209, 210, 212, 218 and 221)*

NEIMAN, United States Magistrate Judge.

On November 5, 2001, after more than two weeks of trial, a jury entered a verdict which was favorable to Anita Horney ("Plaintiff") in this employment discrimination action.[1] The jury found both defendants—Plaintiff's former employer, Westfield Gage Co. ("Westfield Gage"), and her former supervisor, Edward Woodis ("Woodis")—liable to varying degrees; it found Westfield Gage liable for gender discrimination (in the amount of $750,000), for sexual harassment ($250,000) and for an equal pay violation ($8,140), and it found Woodis liable for sexual harassment ($25,000). On November 27, 2001, the court, after calculating interest, entered judgment against Westfield Gage in the amount of $1,077,057.12 and against Woodis in the amount of $31,888.26.

Following the entry of judgment, a number of motions were filed. This memorandum addresses the following five: Plaintiff's Motion to Enforce the Settlement Agreement Between Her and Woodis (Docket No. 218), what the court treats as Woodis' Motion that Westfield Gage be Ordered to Pay the $25,000 Settlement (included within Docket No. 221 (Woodis' Response to Plaintiff's Motion to Enforce)), Westfield Gage's Motion for Judgment Notwithstanding the Verdict (Docket No. 210), Westfield Gage's Motion for a New Trial or for Remittitur (Docket No. 212) and Woodis' Motion for Judgment as a Matter of Law or for a New Trial (Docket No. 209).[2]

For the reasons which follow, the court will allow Plaintiff's motion to enforce the settlement between her and Woodis, deny Woodis' motion to order Westfield Gage to

---

1. The parties had consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b).

2. By margin notations this day, the court has also allowed Plaintiff's Motion to Stay Woodis' Post-Judgment Motion Pending Resolution of her Motion to Enforce the Settlement Agreement (Docket No. 220) and denied, without prejudice, Plaintiff's Motion for Attorney's Fees and Costs (Docket No. 215).

pay the settlement amount and deny, as moot, Woodis' other post-judgment motion. The court will also deny Westfield Gage's post-judgment motions in all but one respect; Westfield Gage will be granted a new trial on Plaintiff's gender discrimination claim unless Plaintiff agrees to remit the $750,000 damages found by the jury on that claim to $187,500.

## I. BACKGROUND

The background is sketched in a light most favorable to the jury's verdict. See O'Connor v. Huard, 117 F.3d 12, 14–15 (1st Cir.1997). Specific facts with respect to the two settlement motions, for which there was a separate evidentiary hearing, are addressed in the court's discussion of those issues.[3]

Plaintiff was employed by Westfield Gage, a machine shop, from April of 1994 until April 9, 1998. (See Plaintiff's Exhibit 4; Docket No. 240 (Transcript Volume ("Tr.Vol.") II) at 58.) At all relevant times, Woodis was Plaintiff's supervisor. (Docket No. 241 (Tr. Vol.I) at 92–93.)

Plaintiff started out as a parts marker with a salary of $8 per hour and ended her tenure at Westfield Gage as an inspector making $10 per hour. (See id. at 74–78.) Plaintiff got her last raise near the end of 1996 directly from Westfield Gage's owner. (Id. at 77–78.) When Woodis found out that Plaintiff went over his head, he stated, according to her testimony: "If you fucking try that again I'll get rid of you. You'll lose your job." (Id. at 78.) Plaintiff never got another raise. (Id.)

Sexually-explicit material was prevalent throughout Westfield Gage. For example, calendars depicting scantily-clad women in suggestive poses and posters of girls in bikinis were "all over the place" (id. at 84–85) and a picture of a woman's breasts was taped to the inside of a light fixture (Docket No. 246 (Tr. Vol.VI) at 36–37). There were Penthouse, Playboy and Hustler magazines in the plant and a gay men's pornographic magazine kept showing up at Plaintiff's desk. (Tr. Vol. II at 86; Docket No. 239 (Tr. Vol.III) at 14.) In addition, jokes with sexual content were passed throughout the shop and some were even displayed publicly. (Tr. Vol. I at 88; Tr. Vol. II at 116–17.) Indeed, at some point during her employment Plaintiff shared a bench with a male worker who kept in his tool box—which he had to open in Plaintiff's view—a picture of a woman in a "seated position with her knees up" who was wearing "very lacy, thin underpants with [her] genitalia" exposed. . (Tr. Vol. I at 103–04.) Further, Ed Menard, Plaintiff's "mentor" in the inspections department, gave her several suggestive postcards, one of which stated: "It's National Vibrator Week[;] Bring One Home To A Friend." (Tr. Vol. II at 42–43; Plaintiff's Exhibit 6.) To be sure, Plaintiff complained about much of the material and it was removed, but it "went right back up" soon thereafter. (See Tr. Vol. III at 46–47.)

The plant was also rife with rough language directed at women. For example, one of Plaintiff's male co-workers once looked at Plaintiff and stated: "Women are only good at getting fucked up the ass at Westfield Gage." (Tr. Vol. II at 43.) Woodis, too, was verbally abusive toward Plaintiff. As Plaintiff testified, "[Woodis] would get right in my face. His veins would pop out of his neck, he'd turn all

---

3. The court's preparation of this background has been hampered by the parties' decision not to cite to the trial transcript, the bulk of which only became available after the parties' memoranda were filed. As a result, the court itself has undertaken the task of reviewing the entire record so as to locate the source of the various factual assertions made in the parties' papers.

red, he'd be pointing his finger at me." (Tr. Vol. I at 113.) Plaintiff also testified that Woodis:

> told her she was "bullshitting" and should just "go ahead [and] fucking leave" when she asked him if she could depart early to take her mother to a doctor's appointment (*id.* at 110);
>
> screamed at her when she broke a tooth and had to leave work to get it fixed (*id.* at 111);
>
> screamed at her when others neglected their duties, asking "How come this job isn't fucking done?" (Tr. Vol. II at 27).
>
> daily asked her "[w]hose desk [she was] under?" ( *id.* at 40–41);
>
> used the words "cunt" and "bitch" in her presence (Tr. Vol. III at 17);
>
> asked her, in front of some male inspectors, if she was "fucking" or "blowing" a male co-worker who dropped off parts at her bench (Tr. Vol. II at 41);
>
> told her that "They never should have hired women in this department" and that "Women don't belong in the ... machine shops" (*id.* at 44–45);
>
> asked her, when she called herself "anal retentive," whether that was "what [her] mother taught [her] to do, lick ass?" (*id.* at 47); and
>
> asked a male co-worker with whom she was having a conversation whether he was "fucking her mother?" (*id.* at 48).

At least one other employee testified that Woodis called Plaintiff a "cunt," a "bitch" and an "idiot," (Docket No. 245 (Tr. Vol.V) at 194), and that another male worker was heard to say "[t]hat there wasn't a woman on the face of the earth worth the paper to wipe his dirty ass," (Tr. Vol. VI at 34–35).

At times, Plaintiff participated in some of the conduct and language. For example, Plaintiff kept and displayed a postcard from her mentor which depicted "bare butts" (see Tr. Vol. II at 42, 203; Plaintiff's Exhibit 5) and another postcard of "guys in bathing suits" (Tr. Vol. I at 86). Also, Plaintiff admitted that, on one occasion, she "might have" worn ripped jeans to work with a hole in the seat (Tr. Vol. II at 151), conceded that she laughed at some of the dirty jokes and the gay men's magazine (Tr. Vol. I at 88; Tr. Vol. II at 86–87) and once, "for a couple of seconds," borrowed someone's wind-up penis toy (Tr. Vol. III at 104–05). Plaintiff also told people at Westfield Gage that she used to have a tattoo of a mouse, but that her "pussy must have got it." (Tr. Vol. II at 204.) In addition, Plaintiff acknowledged that, during her employment at Westfield Gage, she used the terms "cunt," "bitch," "fucking cunt," "fucking bitch" and "young, dumb and full of cum." (*Id.* at 204–05.)

Still, Plaintiff testified that she was most offended by vulgar and profane language that was "abusive and combative"; e.g., Plaintiff felt that the F-word used in joke was not as bad as "F you" stated "in a nasty way." (*Id.* at 183.) In this vein, Plaintiff also testified that there were a "lot of times" that she left the workplace in tears because Woodis or another supervisor was screaming at her. (Tr. Vol. I at 113.)

Plaintiff made a number of informal complaints about the environment at Westfield Gage to Judy Gutt. (See Tr. Vol. II at 209 ("It was a daily thing that I reported [sexual harassment] to Judy Gutt"); Tr. Vol. V at 199 (indicating that Plaintiff seemed to complain to Gutt "on a regular basis").) Gutt, who worked in the accounts payable department, was the employee identified to Plaintiff as her "human resources" contact, i.e., the "person to whom people could make complaints of sexual harassment." (See Tr. Vol. I at 118; Tr. Vol. V at 194, 238–41.) Daniel Berube, Gutt's boss, assigned her that task. (Tr. Vol.65, 240–41.)

Plaintiff also formally reported to Gutt at least one instance of harassment by a male supervisor on a morning in February of 1997. (Tr. Vol. I at 115–18.) On that day, Plaintiff entered the cafeteria at about five minutes to six, the time her shift started, and found five male workers milling around. (*Id.* at 115–16.) The men stated: "Oh good, Anita's here. Coffee's going to be made, vitamins." [4] (*Id.* at 116.) About two minutes to six, the supervisor, Jim Frisbie, walked in, greeted the men and then started yelling and swearing at Plaintiff because she was "wasting company time." (*Id.* at 116–17. See also Tr. Vol. III at 55–56.) Plaintiff reported the incident to Gutt who asked Plaintiff if she wanted to write out a formal complaint, which she did. (Tr. Vol. I at 119.)

As part of her report, Gutt promised Plaintiff that she would thereafter have "a harassment free work environment." (Tr. Vol. II at 96; Tr. Vol. III at 64.) Nonetheless, "the language didn't stop, the posters didn't stop, the jokes didn't stop [and] the pictures didn't stop." (Tr. Vol. III at 64.) Indeed, Plaintiff testified that, following her complaint, Frisbie began following her around, Woodis' comments became more rude and Plaintiff, unlike men, was only allowed to get coffee at break time. (Tr. Vol. II at 46–47.)

Plaintiff testified to a number of other instances of what she perceived was unfair or unequal treatment, often because of her gender. Plaintiff testified that:

Woodis gave her no support in directing the work of other female parts markers (Tr. Vol. I at 93–94); she had to share her inspections bench with a man (*id.* at 103);

Woodis did not swear and scream at men or, at least, yell as loudly at them (*id.* at 110; Tr. Vol. III at 78);

men were allowed to change their schedules to accommodate doctor's appointments "whenever they wanted to" and she never saw a man storm off in tears (Tr. Vol. I at 111–12, 114–15);

she was not properly trained as an inspector after she moved into that department and took on inspections responsibilities (Tr. Vol. II at 29, 34);

men, but not she, were given the opportunity to be "source" inspectors (*id.* at 31);

at least one other man said that women did not belong in a machine shop (*id.* at 44–45); and

she was not given a raise when she moved into the inspections department (Tr. Vol. III at 71).

Plaintiff summarized some of her concerns as follows: "[The men] got to work whatever they wanted to hour-wise, they got paid a lot more than I did, they got raises more than I did, they got scheduled whatever it was needed for them, overtime." (*Id.* at 78.)

When Plaintiff moved into inspections in the Fall of 1997, she, at $10 per hour, was the lowest paid inspector and the only woman. (See Plaintiff's Exhibit 21 (indicating that the other male inspectors were making between $13.50 and $18 per hour).) Westfield Gage argued to the jury that the male inspectors had more experience than Plaintiff and that she was only learning the inspection position on the job. (See Tr. Vol. I at 51–52.) Plaintiff testified, however, as follows: that she had several years of quality control and assembly work prior to her employment at Westfield Gage (see *id.* at 70–71, 97–98; Tr. Vol. II at 124; Tr. Vol. III at 101); that, when hired, she "aced" a mechanical aptitude test Woodis gave her "in less time than anybody's ever done it" (Tr. Vol. I at 74); and that she

4. Plaintiff often packed vitamins for employees. (*Id.* at 77.)

was given certain other supervisory and training responsibilities while at Westfield Gage (see *id.* at 83, 92–93, 97; Tr. Vol. II at 21). Thus, Plaintiff disputed Westfield Gage's contention that she, unlike the male inspectors, was merely a "junior" inspector or an inspector "trainee." In any event, it appears undisputed that Plaintiff's move to inspections was a promotion.[5]

On the morning of April 8, 1998, Plaintiff testified that she and Woodis had a heated verbal exchange with respect to a cause and corrective action form. (Tr. Vol. II at 50–51.) When Plaintiff refused to "stamp . . . off" the form—"because the three girls in the marking department didn't do their job"—Woodis yelled: "Just fucking do your job. If you can't do your job then don't be a fucking stupid idiot." (*Id.* at 51.) Plaintiff started crying, more obscenities were exchanged, and Plaintiff tore up her time card and went to Gutt. (*Id.* at 51–52.) Although Gutt sent Plaintiff home, Plaintiff was called back later that day to meet with Richard Patterson, the general manager. (*Id.* at 52, 54.)[6]

During her meeting with Patterson, Plaintiff requested that he move her to a different position within Westfield Gage. (Tr. Vol. II at 54–44.) Patterson, however, refused, stating "I don't think there's a place for you" and "It's not working out." (*Id.*) As a result, Plaintiff left the premises and her employment at Westfield Gage ended. (*Id.* at 55.) She was thirty-five years old at the time.

Sometime later, Plaintiff returned to Westfield Gage to collect her final pay-check. (*Id.* at 87.) At the time, she was told that she had a box of "personal stuff." (*Id.*) However, included in that box, packed by someone else, was a packet of crude and sexually-explicit jokes and cartoons. (*Id.* at 87–90; Plaintiff's Exhibit 14.) A number of the items—including cartoons graphically depicting male or animal genitalia or sex acts—had previously been displayed on a bulletin board or passed across Plaintiff's work bench. (Tr. Vol. II at 89.) There was no evidence that anything in the packet actually belonged to Plaintiff. (See *id.*)

After leaving Westfield Gage, Plaintiff filed pro se a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"), received unemployment compensation for six months and, in November of 1998, began working at the Points East restaurant in Westfield. (*Id.* at 55–58.) In the interim, Plaintiff unsuccessfully sought work at two or three other machine shops. (*Id.* at 56–57.) At Points East, Plaintiff occasionally saw Westfield Gage employees, including Woodis, come into the restaurant. (*Id.* at 60–61.) This made her feel "[a]wful." (*Id.* at 61.) Ultimately, Plaintiff left Points East—because "[t]oo many Westfield Gage people [were] coming around"—and went to work at a different restaurant. (*Id.*)

Plaintiff testified that from 1994 through 1998, she slept a lot, bit her nails until they bled, stopped eating, and began losing weight and hair. (*Id.* at 83.) Dr. Lloyd Price, a psychiatrist who reviewed deposition testimony and then met with Plaintiff,

---

5. Relevant job descriptions indicate that parts markers needed "no previous experience" while inspectors needed prior "inspection experience." (Plaintiff's Exhibit 15.) (See also Docket No. 244 (Tr. Vol.VIII) at 196 (testimony by Westfield Gage's general manager that Plaintiff's move to inspections was a "promotion").)

6. Gutt testified that, after Plaintiff went home, Woodis swore at Gutt and told her to "call the drunk and drug-crazed bitch and tell her to get her ass back in here." (Tr. Vol VI. at 61.) There was no evidence that Plaintiff was ever under the influence of drugs or alcohol while working at Westfield Gage.

testified about the significant distress Plaintiff experienced at Westfield Gage and the continuing effects of that distress. (See Docket No. 252 (Tr. Vol.IV) at 38–47.) Dr. Price opined that Plaintiff suffered from "major depression." (*Id.* at 46.)

Over Westfield Gage's objection, (*id.* at 168), Plaintiff also presented testimony and charts from an economist, Dr. Allan McCausland. Copies of the charts had been provided to the court in the context of Westfield Gage's in limine motion to exclude portions of Dr. McCausland's testimony. (*Id.* at 170.[7] See also Plaintiff's Exhibit 16.) Dr. McCausland opined that, given Plaintiff's age and work experience and the state of the local employment situation, her "front pay" economic loss ranged from a low-end figure of $573,638 to a high-end figure of $833,169. (See Tr. Vol. IV at 194; Plaintiff's Exhibit 16.) "Front pay," according to Dr. McCausland's calculations, was the amount of wages and benefits Plaintiff would have received had she remained employed at Westfield Gage until retirement, i.e., for about an additional twenty-eight years after the beginning of the trial. (See Tr. Vol. VI at 193–94; Docket No. 185 at 1.)

The trial began on the morning of October 22, 2001. On October 29, 2001, at the close of Plaintiff's case, each defendant moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a).[8] The court generally denied these mid-trial motions, although it did allow dismissal of a "constructive discharge" claim aimed at Westfield Gage and a "retaliation" claim targeting Woodis. (See Docket Nos. 189, 190.) The court also generally denied Defendants' renewed motions for judgment as a matter of law filed at the close of all the evidence, although the court did dismiss Plaintiff's claims for punitive damages. (See Docket Nos. 197 and 198.) Then, just prior to closing arguments, the court dismissed Plaintiff's state-based equal pay claim.

The jury began its deliberations on Friday, November 2, 2001. At that time, six categories of claims remained: a Federal Equal Pay Act ("FEPA") claim targeting Westfield Gage; a claim against Westfield Gage for gender discrimination under Title VII; claims against Westfield Gage for sexual harassment under Title VII and Massachusetts General Laws chapter 151B ("chapter 151B"); a chapter 151B sexual harassment claim against Woodis; a retaliation claim targeting Westfield Gage; and a common law intentional infliction of emotional distress claim aimed at Woodis.

The jury returned a verdict late in the day on Monday, November 5, 2001. With regard to Plaintiff's FEPA claim, the jury found that Plaintiff had established her prima facie case, determined that Westfield Gage had not proven its affirmative defense and assessed damages in the amount of $8,140. As for Plaintiff's gender discrimination claim, the jury found that Westfield Gage had intentionally discriminated against her and that she should be paid $750,000 in damages for her "economic harm," but assessed no damages for

---

7. The motion was denied without prejudice. (See Docket No. 185, margin notation.)

8. By that time, the action had been winnowed significantly. In May of 2000, the court dismissed Woodis and Patterson, as individuals, from Plaintiff's claims under Title VII of the Civil Rights Act of 1964 ("Title VII"). *See Horney v. Westfield Gage Co.,* 95 F.Supp.2d 29 (D.Mass.2000). (See also Docket No. 27.)

Then, in a September 28, 2001, ruling, the court granted Westfield Gage summary judgment with respect to Plaintiff's intentional infliction of emotional distress claim, dismissed Patterson entirely as a defendant and granted Woodis summary judgment with respect to Plaintiff's "constructive discharge" claim. (See Docket No. 150.)

"emotional harm." With respect to Plaintiff's sexual harassment claims targeting Westfield Gage, the jury found that she had established her prima facie case, determined that Westfield Gage had not proven the first element of its affirmative defense and assessed damages for Plaintiff's emotional harm in the amount of $250,000. The jury also found that Woodis had sexually harassed Plaintiff and determined that he should pay $25,000 in damages for her emotional harm. Finally, the jury decided that Westfield Gage was not liable for retaliation and that Woodis was not liable for the intentional infliction of emotional distress.

As indicated, on November 27, 2001, the court, after calculating interest, entered judgment against Westfield Gage in the amount of $1,077,057.12 and against Woodis in the amount of $31,888.26. A few days later, Plaintiff asserts, she settled her claim with Woodis for $25,000, an amount which, according to Woodis, Westfield Gage agreed to pay.

In due course, the parties filed the instant motions and the court heard oral argument. On March 8, 2002, the court held an evidentiary hearing with respect to Plaintiff's motion to enforce the post-trial settlement she allegedly reached with Woodis and Woodis' related motion that Westfield Gage be ordered to pay the settlement amount. All five motions were taken under advisement.

## II. *DISCUSSION*

The court will first address Plaintiff's motion to enforce her settlement agreement with Woodis and Woodis' related motion that Westfield Gage be ordered to pay the $25,000 settlement amount. It will then consider Westfield Gage's motion for judgment notwithstanding the verdict and

its motion for a new trial or for remittitur. Finally, the court will discuss Woodis' motion for judgment as a matter of law or for a new trial.

### A. *PLAINTIFF'S MOTION TO EN-FORCE HER AGREEMENT WITH WOODIS AND WOODIS' MOTION THAT WESTFIELD GAGE BE OR-DERED TO PAY THE $25,000 SETTLE-MENT AMOUNT*

In her sole motion, Plaintiff seeks to enforce the $25,000 settlement she purportedly reached with Woodis a few days after judgment was entered. In response, Woodis (in an argument joined by Westfield Gage) acknowledges that an agreement was reached, but claims it is voidable because he mistakenly believed that Westfield Gage, through its attorney, had agreed to pay any settlement proceeds. Alternatively, Woodis (but not Westfield Gage) requests that, should the court find that his agreement with Plaintiff is enforceable, Westfield Gage should be ordered to pay the settlement amount.

In essence, therefore, there are two motions before the court: (1) Plaintiff's motion to enforce her settlement agreement with Woodis; and (2) Woodis' cross motion that Westfield Gage be ordered to pay the settlement amount. In light of the factual issues inherent in these motions, including questions of authority, the court scheduled an evidentiary hearing. *See Kinan v. Cohen*, 268 F.3d 27, 32–33 (1st Cir.2001) (and cases cited therein). After hearing and for the reasons indicated below, the court will allow Plaintiff's motion, but deny Woodis' cross motion.

### 1. *Findings of Fact* [9]

The "agreement" Plaintiff seeks to have enforced was allegedly consummated be-

---

9. The court has not been provided a tran-

script of the evidentiary hearing. Thus, its

tween her counsel, Donna Cuipylo ("Cuipylo"), and Woodis' counsel, Mark Draper ("Draper"), on or about November 29, 2001. It arose against a series of prior negotiations.

On October 24, 2001, after the third day of trial, Draper had a conversation with Cuipylo in which he offered to settle Plaintiff's claims against Woodis in an amount slightly less than Plaintiff's then outstanding demand. It appears that Woodis was willing to pay this amount from his own pocket even though Draper, evidently, had been attempting to obtain an indemnification agreement from Westfield Gage for quite some time.

The next morning, October 25, 2001, Draper informed Westfield Gage's attorney, Timothy J. Ryan ("Ryan"), that he had been authorized to settle Plaintiff's claim at the amount of Plaintiff's demand, but that Woodis was still seeking indemnification. Ryan immediately so advised Westfield Gage's president, Fred Filios ("Filios"), who told Ryan that, while Westfield Gage would be willing to indemnify Woodis for any "judgment" rendered against him, it would not pay the proposed "settlement." Ryan thereafter informed Draper of Filios' position.

In a hand-delivered letter dated October 25, 2001, Draper memorialized Ryan's representation and asked for Ryan's written confirmation. The very next day, Ryan, via a hand delivered letter, did just that, stating the following:

> Please be advised that I have been authorized . . . to represent that Westfield Gage Company, Inc. will indemnify Mr. Edward Woodis in the event of any judgment against him in the case of *Horney v. Westfield Gage Company, Inc.* This indemnification applies only to judgments entered by the Court and does not extend to any separate settlement by Mr. Woodis with the Plaintiff.

(Woodis' Exhibit 2, Exhibit 4 thereto.) Draper then advised Cuipylo that Plaintiff's last demand was rejected and that Woodis' counter-offer was withdrawn.

As indicated, on November 5, 2001, the jury reached its verdict which, in applicable part, found Woodis liable to Plaintiff for sexual harassment in the amount of $25,000. The next day, November 6, 2001, Draper resurrected settlement discussions with Cuipylo, asking whether, in exchange for $25,000, Plaintiff would consider waiving any request for interest, attorney's fees or expenses with respect to the Woodis claim.

Draper then spoke with Ryan about his conversation with Cuipylo and asked whether Westfield Gage was interested in pursuing such a settlement. Draper confirmed his conversation with Ryan in a letter dated November 6, 2001. In that letter, Draper indicated that, according to Cuipylo, Plaintiff "might be willing to accept the amount of the judgment ($25,000) if paid promptly, thereby [enabling Woodis to] avoid[ ] approximately $6,000 in interest" and again asked Ryan whether "Westfield Gage has any interest in pursuing [such] a resolution." (*Id.*, Exhibit 5.)

Ryan, however, did not pursue the matter with Westfield Gage—later testifying that it "escaped" him—at least until he

factual findings are based on the exhibits entered at the hearing, which include a number of duly-authenticated affidavits, and the court's own memory and notes. *See Worden v. Consolidated Rail Corp.*, 689 F.Supp. 35, 39 n. 1 (D.Mass.1988) (court relies on its own records where no transcript is available). *See* also *Slamon v. Westinghouse Elec. Corp.*, 386 F.Supp. 174, 177 n. 1 (E.D.Pa.1974) (similar); *United States v. 213.43 Acres of Land*, 108 F.Supp. 446, 449 (D.N.D.1952) (similar); *Cosentino v. Herbert H. Landy Ins., Inc.*, 1998 WL 1181735, at *1 (Mass.Super. Sep. 4, 1998) (similar).

received a telephone call from Draper on either November 28, 2001, the day after the court entered judgment, or the following day, November 29th.[10] No matter when this conversation took place, and although Ryan's recollection of it is somewhat vague, Draper testified, and the court finds, that the conversation included a discussion about settling the Woodis claim for $25,000 and about Westfield Gage paying the settlement proceeds. Draper also testified, and the court finds, that, during the telephone conversation, Ryan told Draper to "do it" or words to that effect.

It is undisputed that, on November 29th, Draper spoke with Cuipylo and reached a $25,000 settlement agreement, the terms of which are set out in a draft Agreement for Judgment which Draper forwarded via facsimile to Cuipylo the next day. Draper's November 30th faxed cover letter to Cuipylo "confirm[ed]" that an agreement had been reached and asked that she advise him whether she wished to make any changes to the attached document. (Plaintiff's Exhibit 1, Exhibit B thereto.) At the time, both Cuipylo and Draper had their clients' respective authority to enter into the agreement.

Before sending the November 30th facsimile to Cuipylo, Draper "spoke with . . . Ryan to confirm that the terms and the conditions of the settlement agreement with . . . Cuipylo were acceptable with Westfield Gage." (Woodis' Exhibit 2 ¶ 10.) They evidently were. As Draper averred: "Ryan informed me that the settlement terms were acceptable. My recollection is that the only issue . . . Ryan and I did not discuss on November 29, 2001 was the manner in which Westfield Gage would make payment of the settlement proceeds." (*Id.*) Thus, in a separate commu-

nication with Ryan on November 30th, Draper "confirmed" his conversation and requested information only "as to how payment of the settlement proceeds by Westfield Gage would be made to . . . Plaintiff" (*id.*), i.e., "whether . . . Westfield Gage would make direct payment to [Plaintiff] or route it through [Draper's] account" (*id.,* Exhibit 6 thereto). A November 30th facsimile from Draper to Ryan included a copy of the draft Agreement for Judgment which Draper had forwarded to Cuipylo, along with Draper's November 30th faxed cover letter to Cuipylo in which he had "confirm[ed]" his agreement with her.

Ryan immediately forwarded Draper's correspondence to Filios, although Draper's November 30th letter to Cuipylo was, for some reason, omitted. In any event, Ryan stated in his cover letter to Filios that, "[a]t this point I recommend the settlement." (Westfield Gage Exhibit 2.)

A few days after receiving Ryan's correspondence, Filios—who, in the interim, had discussed the matter with Westfield Gage's general counsel—told Ryan that Westfield Gage did not accept the "proposed" arrangement. Ryan informed Draper of that fact in a telephone call on December 4th, although he gave no reason for the decision. Draper then immediately advised Cuipylo by facsimile dated December 4, 2001, that "Woodis cannot enter into the proposed Agreement for Judgment" and that he would be filing post-trial motions shortly. (Plaintiff's Exhibit 1, Exhibit C thereto.) Plaintiff's present motion and Woodis' cross motion soon followed.

## 2. *Analysis*

The court first considers Plaintiff's motion to enforce her settlement agreement

---

10. The exact day of the conversation is unclear. Draper testified that he conversed with Ryan about settling the Woodis claim on No-

vember 29th (see also *id.* ¶ 10), while Ryan described a conversation with Draper on November 28th.

with Woodis. It then addresses Woodis' cross motion that Westfield Gage be ordered to pay the $25,000 settlement amount.

### a. *Plaintiff's Motion to Enforce*

■ Although the parties utilize a combination of state and federal law, the appropriate standard for determining whether the agreement is enforceable is federal. As the First Circuit recently clarified, federal law must be applied to settlement issues when, as here, the underlying lawsuit is based upon federal law. *See Quint v. A.E. Staley Mfg. Co.*, 246 F.3d 11, 14 (1st Cir.2001), *cert. denied,* — U.S. —, 122 S.Ct. 1618, 152 L.Ed.2d 631 (2002); *Malave v. Carney Hosp.*, 170 F.3d 217, 220 (1st Cir.1999). The fact that the lawsuit also raised state law claims makes no difference. *See Ramirez v. DeCoster,* 142 F.Supp.2d 104, 109 n. 5 (D.Me.2001) ("[T]he presence of pendent or supplemental state law counts ... cannot change the applicability of federal law to efforts to settle the lawsuit. Otherwise, different principles would apply to different counts, and a settlement agreement designed to settle an entire controversy could be enforceable as to some counts and not enforceable as to others, an impossible outcome.").

■ From the facts presented, it is clear that both Cuipylo and Draper had actual authority to enter a binding settlement on behalf of their clients. This case, therefore, differs from *Michaud v. Michaud,* 932 F.2d 77 (1st Cir.1991), *Mason & Dixon Lines, Inc. v. Glover,* 975 F.2d 1298 (7th Cir.1992), and *Milewski v. Roflan Co.* 195 F.Supp. 68 (D.Mass.1961), and other cases where authority was cloudy. It is also clear that the settlement was complete as to its essential terms, i.e., there was a meeting of the minds to the

exchange and consideration. *See Trifiro v. New York Life Ins. Co.,* 845 F.2d 30, 31 (1st Cir.1988); Restatement (Second) of Contracts § 17(1) cmt c. Finally, there is no doubt that the failure of Cuipylo and Draper to formalize the settlement in written form does not void the underlying agreement. *See Quint,* 246 F.3d at 15. Indeed, neither party claims that a fully executed document was required for them both to be bound. *See also Petition of Mal de Mer Fisheries, Inc.,* 884 F.Supp. 635, 641 (D.Mass.1995) (holding that oral agreement to settle claim may be enforced as any other contract); *Wang Labs., Inc. v. Applied Computer Sciences, Inc.,* 741 F.Supp. 992, 1001–01 (D.Mass.1990) (similar), *rev'd on other grounds,* 926 F.2d 92 (1st Cir.1991).

Nonetheless, Woodis argues that the agreement ought to be voidable because of his "unilateral mistake" that Westfield Gage would pay the $25,000. The Restatement defines a "mistake" as "a belief that is not in accord with the facts." Restatement (Second) of Contracts § 151. It then states the following with respect to a unilateral mistake:

> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule in § 154 and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or
>
> (b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts

§ 153.[11]

As to subsection (b) of section 153, there is no argument, let alone evidence, that Plaintiff "had reason to know of the mistake or [her] fault caused the mistake." As to Woodis, the court will assume, for purposes here, that the alleged mistake went to his "basic assumption" and that it would have "a material effect" that would be "adverse to him." The court will also assume, with regard to subsection (a) of section 153, that the effect of the mistake—to wit, forcing Woodis to pay $25,000 out of his own pocket—might well be "unconscionable." Thus, the key question as far as the court is concerned is whether Woodis "[bore] the risk of mistake under the rule in [section] 154." If so, the settlement agreement is not voidable by him.

In the court's opinion, Woodis did bear the sole risk of the mistake. Under subsection (b) of section 154, a party bears the risk of a mistake when "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." Restate-ment (Second) of Contracts § 154(b). Such is the case here. Woodis did not know, undisputably, that Westfield Gage would pay the settlement, but his attorney treated what he did know—Ryan's confirmation "that the settlement terms were acceptable"—as sufficient to enter into the agreement with Plaintiff.

Moreover, even if subsection (b) does not apply, the court, under subsection (c) of section 154, would allocate the risk to Woodis "on the ground that it is reasonable in the circumstances to do so." Restatement (Second) of Contracts § 154(c). Draper was well aware of the risk and carefully tried to avoid it when he sought assurances from Ryan that Westfield Gage would pay the proceeds. The only other alternative—to put the risk of the mistake on Plaintiff whose attorney was specifically faxed the November 30th letter from Draper which "confirm[ed]" that an agreement had been reached—would be manifestly unreasonable and unfair. In short, the court will not allow Woodis to void the settlement agreement because of his alleged unilateral mistake and, therefore, will allow Plaintiff's motion to enforce.[12]

**11.** In many jurisdictions, unilateral mistake is generally not a ground for avoiding a contract. *See Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1034–35 (7th Cir.2000); *Tony Downs Foods Co. v. United States*, 209 Ct.Cl. 31, 530 F.2d 367, 373 (1976); *Anderson Brothers Corp. v. O'Meara*, 306 F.2d 672, 676–77 (5th Cir.1962). *See also Cruz v. Am. Airlines*, 150 F.Supp.2d 103, 116 (D.D.C.2001) (holding that, under law of Maryland, Virginia and Indiana, factual mistake generally allows for rescission of contractual instrument only when mistake is mutual, not unilateral); *Mistretta v. Liberty Mut. Ins. Co.*, 1988 WL 88085, at *4 (E.D.Pa. Aug.22, 1988) (observing that, under Pennsylvania law, "[i]f the mistake is not mutual, but unilateral, and not due to the fault of the party not mistaken, but to the negligence of the party acting under the mistake, no basis for relief has been afforded") (citation and internal quotation marks omitted). However, this court, as Woodis knows, has recognized the Restatement's unilateral mistake provision. *See O'Rourke v. Jason, Inc.*, 978 F.Supp. 41, 48 (D.Mass. 1997). Both the First Circuit and other judges within this district have cited Restatement provisions relating to mistake doctrines. *See, e.g., Berezin v. Regency Sav. Bank*, 234 F.3d 68, 72 (1st Cir.2000); *John Beaudette, Inc. v. Sentry Ins. A Mut. Co.*, 94 F.Supp.2d 77, 143–44 and n. 93 (D.Mass.1999); *Davis v. Dawson, Inc.*, 15 F.Supp.2d 64, 113–14 (D.Mass.1998).

**12.** From the sidelines, Westfield Gage argues that, under a two-decades old Fourth Circuit case, avoidance for a unilateral mistake may be allowed, *inter alia*, if "rescission would impose no substantial hardship on" Plaintiff. *Gamewell Mfg., Inc. v. HVAC Supply, Inc.*, 715 F.2d 112, 117 (4th Cir.1983). To the court's knowledge, there is no decision applying this

In reaching this conclusion, the court in no way blames Draper for the situation; he did practically everything he could to ensure that Westfield Gage was on board before he took the final step.[13] Still, in retrospect, Draper did not obtain precise written confirmation—as he had when he previously sought written confirmation of Westfield Gage's agreement to indemnify Woodis against any judgment—of what he understood, through Ryan, to be Westfield Gage's agreement to pay the settlement before he discussed the matter with Cuipylo. With that in mind, the court turns to Woodis' cross motion that Westfield Gage be ordered to pay the $25,000 to Plaintiff.

### b. *Woodis' Cross Motion*

■ In his response to Plaintiff's motion to enforce, filed on December 21, 2001, Woodis submits that, should the court allow Plaintiff's motion, it must "determine and order that Westfield Gage is obligated to pay the $25,000 designated as the amount of the settlement . . . ." (Docket No. 221 at 4.) Five days later, on December 26, 2001, Westfield Gage tendered a pleading which, although styled an "Opposition to Plaintiff's Motion to Enforce . . . ," also responded to Woodis' cross motion. (See Docket No. 222 at 3 (arguing that

"[t]he evidence is clear that Westfield Gage has not agreed to fund the settlement agreement at this time") and 3–4 (contending that should the court enforce the agreement, Westfield Gage is "entitled to relief due to excusable neglect").) On March 7, 2002, one day before the evidentiary hearing, Westfield Gage filed a "Pre–Hearing Memorandum" which also argued that "Westfield Gage did not agree to pay the amount of the proposed settlement between Plaintiff and . . . Woodis." (Docket No. 236 at 1.) Thus, the issue is joined.[14]

The question raised in Woodis' motion, simply stated, is this: did Westfield Gage agree to fund the $25,000 settlement agreement between Plaintiff and Woodis? Unfortunately for Woodis, the court's answer to that query is "no."

■ It is well settled "that the decision to settle litigation belongs to the client, not the lawyer." *Malave*, 170 F.3d at 221 (citing cases). Thus, "a settlement agreement entered into by an attorney is ineffective if the attorney did not possess actual authority to bind the client, and the cases so hold." *Id.* (citations omitted). Stated another way, "actual authority," not apparent authority, "is the barometer" in cases such as this. *Id. See also Quint*, 246

requirement in the First Circuit, *but see Rand v. M/A–Com, Inc.*, 1993 WL 410874, at *2 (D.Mass. July 19, 1993) (generically citing *Gamewell* with approval), and the court declines to adopt this added element. In any case, Cuipylo testified that she relied on the settlement, contacted creditors and made promises to pay.

13. Draper was so sure that Westfield Gage would pay that, when he confirmed the arrangement with Ryan on November 30th, he simply inquired as to how the payment should be routed. Even though Draper had obviously committed Ryan's client to paying the amount, Ryan remained silent and never warned Draper that his understanding may have been mistaken.

14. Accordingly, the court rejects Westfield Gage's footnote implication that the court has no jurisdiction over Woodis' cross motion and that his only recourse is to commence a separate action against Westfield Gage. (See *id.* at 2 n. 1.) The court gave the parties ample notice that it would consider Woodis' request at the evidentiary hearing. Indeed, even Westfield Gage recognizes in its Pre–Hearing Memorandum the court's "inherent authority to enforce settlement agreements which involve litigation pending before [it]." (*Id.* (citing *Quint*, 246 F.3d at 14, *Malave*, 170 F.3d at 220, and *Mal de Mer Fisheries, Inc.*, 884 F.Supp. at 637).)

F.3d at 13–15 (focusing on issue of whether attorney had actual authority to enter agreement on client's behalf).

There is no question that Ryan lacked actual authority to bind Westfield Gage to pay the $25,000 settlement. The first time Filios, the only one who could grant Ryan authority, learned of Draper's request was when Ryan forwarded him Draper's November 30th correspondence with respect to what Ryan termed a "proposed settlement." After meeting with in-house counsel, Filios promptly told Ryan that Westfield Gage did not accept the "proposed" deal. Given these facts, Ryan did not possess actual authority when he told Draper to "do it" or "that the settlement terms were acceptable." That this may well have been imprudent on Ryan's part does not make it authorized.

The outcome would likely not differ were the court permitted to base its analysis on considerations of apparent authority. *See Malave,* 170 F.3d at 221 n. 6. Apparent authority would have resulted "from conduct by the principal"—i.e., Filios—which would have caused Draper reasonably to have believed that Ryan had authority to agree to the payment arrangement. *See Hinchey v. NYNEX Corp.,* 144 F.3d 134, 141 (1st Cir.1998). *See also* Restatement (Third) of Agency § 2.03 (Tentative Draft No. 2, 2001) (observing that apparent authority must be "traceable to the principal's manifestations"). The court finds that Filios engaged in no such conduct.

c. *Final Thoughts*

Before concluding this section, the court adds some final observations. Judgment against Woodis was entered on November 27, 2001. At that moment, Woodis had the October 26th letter agreement from Westfield Gage to "indemnify [him] ... in the event of any judgment [entered] against him ... by the Court." Thus, had Woodis

done nothing on November 27th—and putting the parties' appellate rights to the side—Westfield Gage would have been obligated to pay Plaintiff $31,888.36. As a result, Draper's actions in negotiating a compromise with Plaintiff would have saved Westfield Gage, were it to fund the settlement, $6,888.36 in interest, not to mention attorney's fees and costs. That is good lawyering on Draper's part.

Even the best lawyering, however, sometimes goes awry. *See Precious v. O'Rourke,* 270 Mass. 305, 170 N.E. 110, 111 (1930) ("When the attorney undertakes to bind his client to an agreement to compromise his client's substantial rights, the opposing party must ascertain at his peril whether the attorney has authority to make the settlement.") This is just such a case. Woodis is now obligated to pay Plaintiff the $25,000 out of his own pocket, since, for the reasons stated, the court will not require Westfield Gage to fund a settlement to which its president did not agree, even though doing so might save it thousands of dollars. Thus, Woodis' plight lies squarely with Ryan who agreed to the arrangement. At the very least, the court urges Westfield Gage, if for equitable reasons only, to seriously consider funding the Woodis settlement.

These final thoughts aside, the court, for the reasons stated, will rule as follows. Plaintiff's motion to enforce her $25,000 settlement with Woodis will be allowed and Woodis' cross motion that Westfield Gage be ordered to pay the $25,000 settlement amount will be denied.

B. *WESTFIELD GAGE'S POST–JUDGMENT MOTIONS*

In the first of its two motions, filed pursuant to Fed.R.Civ.P. 50(b), Westfield Gage makes a number of arguments, many of which were made previously in its Rule 50(a) motions for judgment as a matter of

law and rejected.[15] Westfield Gage's second motion is brought pursuant to Fed. R.Civ.P. 59 and, as such, seeks a new trial.[16] Alternatively, Westfield Gage argues in its second motion that it is entitled to a substantial remittitur of damages.

### 1. *Westfield Gage's Motion for Judgment as a Matter of Law*

Westfield Gage's first motion attacks the three claims for which the jury awarded damages against it: sexual harassment, FEPA and gender discrimination. In the court's view, none of Westfield Gage's arguments justify granting it judgment as a matter of law with respect to any one of these claims.

### a. *Sexual Harassment*

Westfield Gage focuses on three arguments with respect to the Title VII and chapter 151B sexual harassment claims for which the jury awarded Plaintiff $250,000 in emotional damages. The court finds all three arguments unavailing.

▪ First, Westfield Gage asserts that Plaintiff failed to establish unlawful sexual harassment because, based on her own admitted conduct, she did not find the alleged hostile environment to be "unwelcome" or "offensive." *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting that sexually objectionable environment must be "one that a reasonable person would find hostile or abusive, *and one that the victim in fact did perceive to be so* ") (emphasis added). Westfield Gage fails to fully recognize, however, that even "[v]oluntary participation in acts that constitute sexual harassment ... does not necessarily bar recovery ...." *Beaupre v. Cliff Smith & Associates,* 50 Mass.App.Ct. 480, 738 N.E.2d 753, 763 n. 15 (2000) (citing, *inter alia, Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)), *rev. denied,* 433 Mass. 1101, 742

---

**15.** Rule 50(a), under which Westfield Gage's mid-trial motions were brought, is entitled "Judgment as a Matter of Law" and states as follows:

> (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
>
> (2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

Rule 50(b), under which Westfield Gage's first post-trial motion is brought, deals with renewing such motions after trial and states, in pertinent part, as follows:

> If, for any reason, the court does not grant a motion for judgment as a matter of law

made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may: (1) if a verdict was returned: (A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of judgment as a matter of law ....

**16.** In pertinent part, subsection (a) of Rule 59, which describes the procedure for new trial motions states as follows:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ....

N.E.2d 81 (2001). The mere fact that a plaintiff participates in some workplace conduct that is sexual "does not, by itself, prove that the conduct is welcome and that she does not perceive her environment to be hostile." *Lawless v. Northeast Battery & Alternator*, 2001 WL 1805185, at *1 (MCAD Nov. 30, 2001). Nor does it suggest that she "enjoyed or appeared to enjoy the campaign of harassment against her." *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1011 (7th Cir.1994).

In this vein, the court flatly rejects the implication lurking in Westfield Gage's memoranda that there is no difference between Plaintiff's use of sexual epithets (e.g., "cunt" and "bitch") and the use of the same or similar words by male employees, some of whom were her supervisors. (See, e.g., Docket No. 211 at 3 n. 1 (describing Plaintiff's position as "nothing more than a cynical sexual stereotype").) Decades ago, Justice Oliver Wendell Holmes observed that "[a] word is not a crystal, transparent and unchanged" but "is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918). Like the word "nigger," *see* RANDALL KENNEDY, NIGGER: THE STRANGE CAREER OF A TROUBLING WORD 34–55 (Pantheon Books 2002) (chronicling historical difference between African Americans' use of "nigger" and use by racist whites), the court believes that "cunt"— and similar epithets pertaining to women—is just such a word.

Indeed, many courts have concluded that there may well be a profound difference between a harassed woman's use of sexually-explicit language (and conduct) and similar language (and conduct) used by men. *See Carr*, 32 F.3d at 1011 (holding that sexually explicit words and conduct of female shop-worker cannot be used to justify similar conduct by men and exonerate their employer); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987) (finding it improper for trial judge to suggest that plaintiff's own use of foul language or sexual innuendo meant that she welcomed similar behavior by male co-worker); *Van Jelgerhuis v. Mercury Fin. Co.*, 940 F.Supp. 1344, 1361 (S.D.Ind.1996) (holding that "a woman does not forfeit her right to be free from sexual harassment by virtue of her participation in sexual banter"); *Kahn v. Salerno*, 90 Wash. App. 110, 951 P.2d 321, 327–28 (1998) (concluding that plaintiff "did not waive her legal protections against unwelcome harassment by using foul language" such as "fuck," "fucking" and "bitch"). As Judge Posner of the Seventh Circuit Court of Appeals has written, the use of foul language "may be defensive; may be playful rather than hostile or intimidating; may be colored by tone or body language; [or] . . . may be done in a placating, conciliatory, or concessive manner in an effort to improve relations with hostile or threatening coworkers." *Galloway v. Gen. Motors Service Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996), *abrogated on other grounds, National R.R. Passenger Corp. v. Morgan*, —— U.S. ——, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The jury rationally could have considered such to be the case here. As Dr. Price testified on cross examination:

[Plaintiff]'s occasional use of profanity represented an adaption to an environment in which the use of profanity was rife. In this regard, she described herself as having become "crusted," e.g., hardened to the use of profanity. This use of profanity represented both an attempt to "fit in" and to adjust, e.g., survive in her environment. This behavior was not typical of [Plaintiff] ei-

ther before or following her having worked at Westfield Gage.

(Tr. Vol. IV at 60–61.)

The only potentially contrary decisions which Westfield Gage discusses in any detail are inapposite. *See Ramsdell v. Western Mass. Bus Lines, Inc.*, 415 Mass. 673, 615 N.E.2d 192 (1993); *Zereski v. Am. Postal Workers Union*, 2001 WL 1602782 (MCAD Oct. 23, 2001). Each of these cases turned on credibility determinations that went against the particular claimant.[17] Here, in contrast, the jury obviously made a different credibility finding, that Plaintiff, despite some participation on her part, objectively perceived the overall environment at Westfield Gage to be hostile, abusive and unwelcome. And the jury had sufficient evidence upon which to ground that conclusion; for example, Plaintiff's testimony that she complained about the language and other sexually explicit materials and that she often left the workplace in tears because of that environment. The court is loathe to upset such credibility determinations, *see Gray v. Genlyte Group, Inc.*, 289 F.3d 128, 141 (1st Cir. 2002) (observing that "credibility is preeminently a jury matter"), and, as a result, rejects Westfield Gage's first argument.[18]

■ Second, Westfield Gage argues that its alleged conduct was not gender-related and, thus, did not rise to the level of actionable sexual harassment. In pursuing this argument, Westfield Gage appears to describe the environment, at worst, as merely one of crude language directed equally at males and females. Therefore, Westfield Gage asserts, no reasonable jury

---

**17.** In *Ramsdell*, for example, the court upheld the decision of the fact finder, an MCAD commissioner, that the plaintiff could not recover for sexual harassment, despite a work environment that was "rife with sexually explicit language and innuendos," because she was a willing participant. *Id.* at 194–95. Similarly, in *Zereski*, an MCAD hearing officer in his findings of fact and conclusions of law found that the plaintiff "regularly used profanity in the office [and] ... her use and general acceptance of profanity undermine[d] her claim that the use of profanity in the office [by others] severely offended her." *Id.*, 2001 WL 1602782, at *21. *See also Balletti v. Sun–Sentinel Co.*, 909 F.Supp. 1539, 1547 (S.D.Fla.1995) (case cited by Westfield Gage wherein factfinder recognized that unwelcomeness question turns " 'largely on credibility determinations committed to the trier of fact' ") (quoting *Meritor*, 477 U.S. at 68, 106 S.Ct. 2399); *King v. Abdow Corp.*, 1996 Mass. Discrim. L. Rptr. 244 (MCAD Nov. 15, 1996) (yet another case cited by Westfield Gage in which credibility findings by an MCAD factfinder went against the plaintiff). In still another unreported case cited by Westfield Gage, the court actually denied summary judgment with respect to the one sexual harassment claim that was not time-barred and there was no indication that the plaintiff participated in any sexually-related conduct.

*See Conto v. Concord Hosp., Inc.*, 2000 WL 1513798 (D.N.H. Sep.27, 2000), *aff'd*, 265 F.3d 79 (1st Cir.2001).

**18.** Other decisions referred to peripherally by Westfield Gage are similarly distinguishable. *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721 (8th Cir.2000), for example, was solely a foul language case where, unlike here, the plaintiff "failed to demonstrate that the discrimination was based on sex." *Id.* at 737. *See also Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir.1999) (noting that, despite the plaintiff's participation, none of the incidents "was severe or pervasive enough so as to alter a term, condition, or privilege of her employment"); *Reed v. Shepard*, 939 F.2d 484, 487 (7th Cir.1991) (dismissing sexual harassment-termination claim of female corrections officer who not only "reveled in the sexual horseplay, instigated a lot of it, and had 'one of the foulest mouths' in the department," but was linked to marijuana trafficking and the beating of an inmate). The remaining cases cited by Westfield Gage have nothing to do with sexual harassment. *See Turnpike Motors, Inc. v. Newbury Group, Inc.*, 413 Mass. 119, 596 N.E.2d 989 (1992) (action by seller of car dealership to enjoin broker from interfering with sale); *Uccello v. Gold'n Foods*, 325 Mass. 319, 90 N.E.2d 530 (1950) (minority stockholder's suit alleging mismanagement).

could have concluded that the conduct was directed at Plaintiff because she is a woman. Relatedly, Westfield Gage maintains that the harassment was not "severe and pervasive" as a matter of law.

■ For an environment to be actionable under Title VII, the harassment must be "sufficiently severe or pervasive to alter the conditions of the '[plaintiff]'s employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *White v. New Hampshire Dep't of Corrections*, 221 F.3d 254, 259 (1st Cir.2000). *See also Muzzy v. Cahillane Motors, Inc.*, 434 Mass. 409, 749 N.E.2d 691, 694 (2001) (similar standard under chapter 151B). The harassment must also be "because of ... sex," *Oncale*, 523 U.S. at 81, 118 S.Ct. 998, although under chapter 151B even "[c]onduct which is not specifically sexual in nature may nonetheless be evidence of sexual harassment," *Morehouse v. Berkshire Gas Co.*, 989 F.Supp. 54, 62 (D.Mass.1997) (citing *Melnychenko v. 84 Lumber Co.*, 424 Mass. 285, 676 N.E.2d 45 (1997)).

In light of the factual background—detailed above—the court believes that there was ample evidence for the jury to have reasonably found that Westfield Gage's conduct was both gender-related and so severe and pervasive as to constitute sexual harassment. To be sure, neither Title VII nor chapter 151B are "general civility code[s]" and the sporadic use of vulgar or abusive language, without more, is not actionable. *See Faragher*, 524 U.S. at 788, 118 S.Ct. 2275; *Cody v. Sutar*, 1997 WL 109563, at *3 (Mass.Super. Mar. 11, 1997). Here, however, the jury could have reasonably determined that the sexually-charged and abusive language was used regularly by men toward women and that there was

a host of other objectionable conduct, e.g., calendars, pictures, jokes and posters. Thus, at the very least, the questions of whether Westfield Gage's conduct was gender-based and sufficiently severe and pervasive were appropriately submitted to the jury for its determination. *See Conner v. Schrader–Bridgeport Intern., Inc.*, 227 F.3d 179, 199–200 (4th Cir.2000) ("[T]he legal principle that whether ... harassment [is] sufficiently severe or pervasive to create a hostile work environment [under Title VII] is quintessentially a question of fact for the jury.") (citations and internal quotation marks omitted); *Morehouse*, 989 F.Supp. at 62 ("To determine whether the effects of harassment ... create a hostile work environment under chapter 151B, the court must ... approach the evidence from the view of a reasonable person in the plaintiff's position.") (citations and internal quotation marks omitted).

■ Third, Westfield Gage argues that Plaintiff's sexual harassment claims cannot stand as a matter of law because she, assertedly, failed to report the alleged behavior of her harassers. In so arguing, Westfield Gage relies on the affirmative defense formulated by the Supreme Court in *Faragher* and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), with respect to Title VII sexual harassment claims.

There are two elements to the *Faragher–Ellerth* affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. *See also Ellerth*, 524 U.S. at 762–63, 118 S.Ct.

2257.[19] In pursuing its argument, it appears that Westfield Gage is targeting the second element of that defense.

In the court's view, Westfield's Gage's argument falls short for a number of reasons. For one thing, and most importantly, the jury never reached the second element of the *Faragher–Ellerth* affirmative defense. Rather, the jury determined that Westfield Gage failed to demonstrate the first element of its defense, i.e., that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior in the workplace. (See *id.;* Docket No. 203, Special Verdict Question No. 9.)

Even had the jury reached the second element, the court believes that, as detailed above, there was ample evidence that Plaintiff took some care to avoid the harm and, in fact, filed a formal report with respect to at least one incident. She also complained to Gutt, her human resources contact, "on a regular basis" if not "daily." To the extent the jury may have credited this or other similar evidence of reporting, the court will not second-guess its factual determination. *See Conto*, 2000 WL 1513798, at *5 (holding, in case cited by Westfield Gage, that "[m]erely showing that an employer had a written policy and grievance procedure does not demonstrate as a matter of law that the employer took reasonable steps to prevent sexual harassment in its workplace") (citing decisions from Third, Fourth, Seventh and Ninth Circuits), *aff'd*, 265 F.3d 79 (1st Cir.2001).

Granted, Westfield Gage initially contended that Patterson and Berube, not Gutt, were "the individuals identified in the sexual harassment policy as contact persons," (Docket No. 211 at 8), but that alleged distinction makes no difference to this issue. Gutt was specifically identified to Plaintiff as her human resources contact and as the person to whom sexual harassment complaints should be made. Even Berube, Gutt's boss, conceded that Gutt was charged with investigating workplace complaints.

Finally, it was not a foregone conclusion that Westfield Gage was even entitled to a *Faragher–Ellerth* affirmative defense instruction and corresponding special verdict questions. As the Supreme Court stated in *Faragher*, "[n]o affirmative defense is available ... when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.*, 524 U.S. at 808, 118 S.Ct. 2275 (citation omitted). In the case at bar, Plaintiff's presentation was peppered with allegations that she was subjected to a number of adverse employment actions, including her eventual discharge. *See* discussion, *infra*, at II(C)(1)(c). Indeed, Westfield Gage's own proposed sexual harassment instructions recognized the point. (See Docket No. 156 ¶ 12.) Thus, it is conceivable that, had Plaintiff objected, the court might have properly eliminated the *Faragher–Ellerth* affirmative defense altogether. The fact

---

**19.** In the case at bar, the court captured the affirmative defense in the following jury instruction:

In order to prevail on its affirmative defense, Westfield Gage must prove ... by a preponderance of the evidence:

First: That Westfield Gage exercised reasonable care to prevent and correct any sexually harassing behavior in the workplace; and

Second: That Plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by Westfield Gage to avoid or correct the harm or otherwise failed to exercise reasonable care to avoid harm.

(Docket No. 201, Instruction No. 58.)

that the jury considered the defense only helped Westfield Gage.[20]

### b. *FEPA*

Westfield Gage aims two arguments at the FEPA claim for which, as indicated, the jury awarded Plaintiff $8,140 in damages: (1) that Plaintiff failed to make out a prima facie case of FEPA discrimination; and (2) that Westfield Gage sustained its burden of proof with respect to its FEPA affirmative defense. The court finds neither argument sufficient to grant judgment in Westfield Gage's favor.

■■ Westfield Gage first argues that Plaintiff failed to make out a prima facie case of discrimination under FEPA because she failed to prove that it paid different wages to men for "substantially equal" work. *See McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 298 (1st Cir.1998) (outlining elements of FEPA prima facie case). In the court's view, Westfield Gage's argument is misplaced for a number of reasons.

For one thing, the jury could have reasonably compared Plaintiff's initial position as a parts marker to entry level men in the burring department. Plaintiff was initially hired in parts marking, an area described by Frisbie, Westfield Gage's Vice President of Manufacturing, as one for new employees "with limited experience." (Tr. Vol. III at 186.) Another such area, Fris-

bie testified, was burring. (*Id.*) Frisbie himself started his career in burring at age sixteen. (*Id.* at 142, 184.)

As a parts marker, Plaintiff, from 1994 to 1997, made between $8 and $10 per hour. The wages of several new male burrers during the same time frame, however, were higher. For example:

Leon LaFreniere, Jr., started in burring in 1995 at $13 per hour and by 1996 was making $13.50 per hour;

Kevin Williams started in burring in 1995 at $10 per hour and by 1997 was making $11.50 per hour; and

Daniel Minelli started in burring in 1997 at $10 per hour.

(See Plaintiff's Exhibit 20; Westfield Gage's Exhibit 5.)[21] Granted, LaFreniere came to Westfield Gage with sixteen years experience as a machinist—as compared to Plaintiff's several years of quality control and assembly work—but Williams had only two years of engineering at a community college and one year of burring prior to coming to Westfield Gage, and Minelli, when he started, had only some "military" and one year of burring experience. (Westfield Gage's Exhibit 5.) Thus, it was not unreasonable for the jury to have concluded that Plaintiff, as an entry-level parts marker, was paid less than similarly-situated, entry-level male burrers.

In addition, the jury could have reasonably concluded that, while Plaintiff's move

---

**20.** It should be noted that, while Plaintiff's sexual harassment claims against Westfield Gage were pursued under both federal and state law, courts have uniformly held that Massachusetts does not allow the *Faragher–Ellerth* defense in chapter 151B actions. *See Myrick v. GTE Main Street Inc.*, 73 F.Supp.2d 94, 98 (D.Mass.1999). *See also Sarin v. Raytheon Co.*, 905 F.Supp. 49, 53 n. 1 (D.Mass. 1995); *Richards v. Walter Fernald State Sch.*, 2000 WL 1473024, at *3 (Mass.Super. Jul. 31, 2000); *Janovich–Earle v. Integrity Int'l Sec. Servs., Inc.*, 1999 WL 791954, at *5 n. 4 (Mass.Super. Aug. 3, 1999). For whatever

reason, Plaintiff chose not to object to the court's *Faragher–Ellerth* instructions and, in fact, proposed a jury instruction which tracked those decisions. (See Docket No. 170 at 16–17.)

**21.** By comparison, Kristain Nelson—the only identified female machinist, and the lowest paid—stared in burring in 1996 at $8 per hour, the same wage she maintained through 1998. (Plaintiff's Exhibit 20; Westfield Gage's Exhibit 5.)

to inspections included no wage increase, it was clearly a promotion. As Frisbie testified, it would have been a step up had she moved from the male-dominated burring department into inspections. (See Tr. Vol. III at 188–89 ("[W]e started them maybe in burring and then if they showed progress they would go up[,] maybe work inspection three or four months to learn how to check parts.") and 193 (noting that if workers became proficient at burring they might "progress to inspection").) Yet Plaintiff received no wage increase when she moved into inspections.

It would not have been unreasonable for the jury to have concluded as well that Plaintiff's job as an "inspector," even as an inspector "trainee," was similar, if not more difficult, than higher-paying jobs held by some men as "lappers." The relevant job descriptions state that, for lappers, prior experience is "helpful, but not required" and "[p]revious job shop experience [is] helpful, but not necessary." (Plaintiff's Exhibit 15.) For inspectors or inspector trainees, however, prior experience is "required"—as is "[k]nowledge of geometric tolerancing" and "[p]revious job shop experience"—and "[m]achining experience [is] preferred." (Id.) To be sure, lappers had to be "*[h]ighly* knowledgeable and *proficient* in geometric tolerancing," (id. (emphasis added)), but Frisbie affirmed that, in practice, geometric tolerancing was a skill that a lapper "develops over time as [he] become[s] a lapper or as [he] works on that position," and that such experience, in reality, was "not required" (Tr. Vol. III at 168).

Again, during the end of 1997 and the beginning of 1998, Plaintiff made $10 per hour as an inspector. Certain male lappers, however, made more during the same time frame. For example:

Todd Koivisto started in lapping in 1994 at $10 per hour and by 1997 was making $12.50 per hour.

Edward Neid was rehired in lapping in 1997 at $15 per hour; and

Harry Schumann was restarted in lapping in 1997 at $13 per hour and later that year was making $14 per hour.

(See Plaintiff's Exhibit 20; Westfield Gage's Exhibit 5.) Granted, by 1997, Neid had fourteen years experience as a machinist and Schumann had twenty-five years experience as a lapper or a grinder. (Westfield Gage's Exhibit 5.) But Koivisto, not unlike Plaintiff, came to Westfield Gage with only four years in another company's finishing department. (Id.) Thus, it was not unreasonable for the jury to have concluded that Plaintiff, as an inspector, was paid less than similarly-situated (or perhaps even less experienced) male lappers. See E.E.O.C. v. State of Rhode Island, 549 F.Supp. 60, 67 (D.R.I.1982) (noting that the similarity of effort may be measured by the physical or mental exertion needed for particular jobs), aff'd, 720 F.2d 658 (1st Cir.1983).

Further, the jury may have reasonably concluded that, as an inspector, Plaintiff was paid less than similarly situated male inspectors. There was only one written job description for inspectors, entitled "Inspector or Trainee." (Plaintiff's Exhibit 15.) [22] In 1997, Plaintiff was paid $10 per hour as an inspector, but the male inspectors were paid between $13.50 and $18 per hour. (Plaintiff's Exhibit 21.) Also, there was evidence that Plaintiff was experienced in inspections and thus entitled to a higher wage; as indicated, Plaintiff had

---

**22.** There were also "First Piece Inspector[s] or Trainee[s]" (see *id.*), but Westfield Gage did not clearly identify which men in the inspections area had such designations. The court, therefore, assumes that all inspectors other than Woodis, the "Chief Inspector," were mere "Inspector[s] or Trainee[s]."

several years of quality control work prior to her employment at Westfield Gage, had worked as a parts marker in the inspection department for three and one-half years, "aced" an entry level mechanical aptitude test faster than anyone else, and was given certain other supervisory and training responsibilities. Finally, there was evidence that the general "working conditions" for most of the shop jobs, e.g., exposure to internal or external elements, were basically the same. *See E.E.O.C. v. Rhode Island*, 549 F.Supp. at 68. In all, the jury could have reasonably concluded that Westfield Gage paid different wages to men "for substantially equal work" and, thus, that Plaintiff made out a prima facie case of FEPA discrimination.

For similar reasons, the court rejects Westfield Gage's second argument that the jury could not have reasonably found that Westfield Gage failed to sustain its burden of proof with respect to its FEPA affirmative defense. *See McMillan*, 140 F.3d at 298 (holding that once FEPA plaintiff makes prima facie showing of wage discrimination, burden shifts to employer to prove that pay disparity can be explained by legitimate factor such as seniority or performance). The jurors were instructed under the statute and specifically asked whether Westfield Gage had persuaded them that the pay differences were in any way attributable to a factor other than sex. (See Docket No. 201, Instruction Nos. 27(c) and 28.) Their answer—supportable by the evidence—was "no." (Docket No. 203, Special Verdict Question No. 2.) The court, therefore, declines Westfield Gage's request to substitute the word "yes" for the jury's answer on this issue. *See Stanziale v. Jargowsky*, 200 F.3d 101, 108 (3rd Cir.2000) (describing FEPA affirmative defense test as whether "no rational jury could find to the contrary").

### c. *Gender Discrimination*

For the most part, Westfield Gage's arguments with respect to the Title VII gender discrimination claim, for which the jury awarded Plaintiff $750,000 in economic damages, merely repeat contentions made either in its summary judgment motion or its Rule 50(a) motions. For the following reasons, the court will again decline to enter judgment in Westfield Gage's favor on Plaintiff's gender discrimination cause of action.

Both Plaintiff and Westfield Gage analyze the Title VII gender discrimination claim within the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The three stages of that analysis are well documented and can be summarized as follows for purposes here. First, Plaintiff had to establish a prima facie case, which typically means a showing that (1) she was a member of a protected class; (2) she met legitimate job performance expectations; (3) she experienced an adverse employment action; and (4) Westfield Gage replaced her with a person who had roughly equivalent qualifications. *See Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir.1994); *Weston–Smith v. Cooley Dickinson Hosp., Inc.*, 153 F.Supp.2d 62, 70 (D.Mass.2001), *aff'd*, 282 F.3d 60 (1st Cir.2002). As Westfield Gage recognizes, Plaintiff's prima facie burden was "not onerous." *Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir. 2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Were Plaintiff to accomplish her task, the burden would shift to Westfield Gage to produce a valid, nondiscriminatory reason for the adverse action. *See Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir.1999). At this second stage, Westfield Gage only had the burden of production

which, if sustained, would cause the presumption of unlawful discrimination to disappear. *Weston–Smith,* 153 F.Supp.2d at 70 (citing *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995)), *aff'd,* 282 F.3d 60.

At the third and final stage of the *McDonnell Douglas* paradigm, the burden would shift back to Plaintiff. Specifically, Plaintiff would have "the burden of persuasion to establish by a preponderance of the evidence 'that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Weston–Smith,* 153 F.Supp.2d at 70 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)), *aff'd,* 282 F.3d 60.

■ In the case at bar, the jury reasonably could have determined that Plaintiff satisfied her prima facie burden. As to the first two factors, Plaintiff is obviously female (the first factor) and easily met Westfield Gage's legitimate job performance expectations (the second factor): she aced her entrance test, had never been formally disciplined, was given supervisory and training responsibilities, had received several raises and had been promoted to the inspections department.

As for the third factor, Plaintiff claims to have suffered a number of adverse actions leading up to her dismissal. Although neither side points to any legal definition of an "adverse employment action," both assume that, like termination, a properly-shown constructive discharge can constitute such. This appears to be

true. *See Suarez v. Pueblo Intern., Inc.,* 229 F.3d 49, 56 (1st Cir.2000) (describing "constructive discharge" as "adverse employment action"). It also appears, however, that, in proper circumstances, employment actions short of dismissal can be considered "adverse employment actions" under Title VII. *See Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 47 (1st Cir.1998) (listing in Title VII retaliation context "variety" of employment actions considered "adverse," e.g., "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees"); *Wyatt v. City of Boston,* 35 F.3d 13, 15–16 (1st Cir.1994) (similar). *See also International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (describing "disparate treatment" gender discrimination as "the most easily understood type of discrimination" since "[t]he employer simply treats some people less favorably than others because of their ... sex"). In its reply memorandum, Westfield Gage seems to concede this point.[23]

Viewing Plaintiff's constructive discharge as the adverse employment action, Westfield Gage contends that Plaintiff cannot show, as she must, that her working conditions were so intolerable that a reasonable person in her position would have felt compelled to resign. *See Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 26 (1st Cir.1997); *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir.1986). In the court's view, however, the jury could have easily made such a

---

**23.** In its initial memorandum filed in support of its new trial motion, discussed *infra,* Westfield Gage asserted that the court's instruction as to non-termination based gender discrimination was an "avant-garde theory." (Docket No. 214 at 9.) It cited no case law in support of this assertion. However, in its

reply brief, filed by new counsel, Westfield Gage specifically discussed "non-termination based [gender] discrimination" and, thus, implicitly recognized that employment actions short of dismissal can be considered "adverse employment actions" under Title VII. (Docket No. 230 at 14–15.)

finding, even if, as Westfield Gage argues, Plaintiff had to demonstrate "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Moore v. Dartmouth College*, 2001 WL 1326584, at *11 (D.N.H. Sep.28, 2001). The facts, exhaustively detailed above, speak for themselves.[24]

The court also rejects Westfield Gage's assertion that other employment actions fall short of the "adverse" mark as a matter of law. For example, as Plaintiff points out, the jury could have reasonably found that Plaintiff, in addition to being subjected to a hostile work environment, received less training than some male employees, was kept in the dark about certain raise and overtime opportunities and was not offered a transfer on the day her employment ended. Plaintiff also testified to the following: that Woodis gave her no support in directing the work of others; that Woodis would not swear and scream at men or, at least, yell as loudly at them; and that men, but not she, were allowed to change their schedules to accommodate medical appointments. In addition, Plaintiff testified that, following the Frisbie incident, she, unlike men, was only allowed to get coffee at break time. Plaintiff summarized some of her concerns as follows: "[The men] got to work whatever they wanted to hour-wise, they got paid a lot more than I did, they got raises more than I did, they got scheduled whatever it was needed for them . . . ."

As for the fourth prima facie factor—which applies only when dismissal or constructive discharge is the adverse employment action—Westfield Gage asserted in its initial memorandum that a gender discrimination plaintiff must demonstrate that "her employer replaced her with a *male employee* with roughly equivalent or lesser qualifications." (Docket No. 211 at 10 (emphasis added).) But the case Westfield Gage cites for this proposition, *Smith v. Stratus Computer, Inc.*, states merely that, for the fourth factor, Plaintiff must show that "her employer sought a replacement for her with roughly equivalent qualifications." *Id.*, 40 F.3d at 15. *Accord Williams*, 220 F.3d at 19; *Byrd v. Ronayne*, 61 F.3d 1026, 1030–31 (1st Cir. 1995). It says nothing about the gender of the replacement.[25]

Regardless, as Plaintiff notes in her memorandum, the evidence at trial revealed the following: "that several male inspectors were hired after [Plaintiff]"; that "[s]everal machinists were hired in 1998"; that, "[d]uring the relevant period several machinists were hired with [one] year or less experience"; that a woman "was hired as a machinist in late 1998 or early 1999 then moved into inspections with only one year of machine shop experience"; that, "[a]t the time she quit, [Plaintiff] had approximately [eight] years in Quality Control"; and that "Westfield Gage placed an ad in the 'Help Wanted' section of the May 31, 1998 edition of the [local newspaper] seeking inspectors with [five] years of experience." (Docket No. 225 at 17.) Crediting this evidence, the court finds that, insofar as the jury may

---

24. Of course, the jury could have concluded, alternatively, that Plaintiff was not constructively discharged, but fired. (See, e.g., Plaintiff's Exhibits 4 (Westfield Gage paperwork indicating Plaintiff was "terminated" on April 19, 1998) and 10 (MCAD charge in which Plaintiff alleged she "was terminated"). See also Tr. Vol. II at 55 (Plaintiff testified that

she "left" only after Patterson told her "I don't think there's a place for you" and "It's not working out.").)

25. Westfield Gage does not even mention the fourth factor in its reply brief and, as a result, seems to abandon any argument that Plaintiff had to show that she was replaced by a man.

have deemed the adverse action to be Plaintiff's termination or constructive discharge, she amply satisfied the fourth prong of her prima facie case of gender discrimination. Moreover, the jury, as indicated, could have found a number of non-termination related adverse employment actions for which the fourth prima facie factor would not be required.

■ With regard to the second stage of the *McDonnell Douglas* framework, Plaintiff appears to concede that Westfield Gage produced "legitimate" reasons for its adverse employment actions, i.e., that it always acted in accord with appropriate business decisions. The remaining dispute, therefore, is whether there was sufficient evidence for the jury to reasonably conclude, at the third stage, that Westfield Gage's proffered reasons were a pretext for discrimination.

In the court's view, the jury could have reasonably found that Westfield Gage's actions were pretextual. For example, in addition to the testimony and environment detailed above, there was evidence that men who could not perform their jobs were reassigned, that Plaintiff and other women (but not men) frequently left the work-site distraught and that, prior to Plaintiff's last day of work, she had not been disciplined. Granted, Westfield Gage attempted to present to the jury a very different view of these same matters. The jury, evidently, rejected these alternatives. More to the point, insofar as the jury had to make credibility determinations in finding pretext, this court will not invade that process. *See Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (explaining that pretext analysis necessarily involves deciding whether "the employer's proffered explanation is unwor-

thy of credence") (citation and internal quotation marks omitted). At bottom, as with the sexual harassment and FEPA claims, the court will not enter judgment in Westfield Gage's favor with respect to Plaintiff's Title VII gender discrimination cause of action.

### 2. *Westfield Gage's Motion for a New Trial or Remittitur*

In its second motion, Westfield Gage argues that a new trial should be granted for three reasons: (1) the verdict is against the weight of the evidence; (2) there were errors in admission or rejection of evidence as well as in jury instructions; and (3) the damages are excessive. *See Cigna Fire Underwriters Co. v. MacDonald & Johnson, Inc.*, 86 F.3d 1260, 1262–63 (1st Cir.1996). With regard to damages, Westfield Gage also seeks a remittitur. The court considers each argument in turn.[26]

#### a. *Weight of the Evidence*

Westfield Gage contends first that a new trial is warranted because Plaintiff failed to meet her burdens of proof with respect to her sexual harassment, FEPA and gender discrimination claims. For the reasons stated above, the court disagrees. Accordingly, the court concludes that the verdict was not against the weight of the evidence and will not order a new trial on that basis.

#### b. *Alleged Evidentiary and Jury Instruction Errors*

■ Westfield Gage also asserts that three alleged evidentiary and jury instruction errors "deserve special mention." First, Westfield Gage argues that the

---

**26.** In considering Westfield Gage's motion for a new trial or remittitur, the court focuses initially on the arguments deemed significant enough by Westfield Gage to be incorporated into its detailed reply brief. Even so, the court touches on Westfield Gage's remaining arguments in part II(C)(2)(d) below.

court's failure to permit a "clean language" instruction severely prejudiced Westfield Gage.[27] The court disagrees. As an initial matter, Westfield Gage cites no decision where the alleged omission of a "clean language" instruction was deemed so prejudicial as to warrant a new trial. More importantly, in the court's view, it properly instructed the jury that this case was about all the hostile "conduct," including language, to which Plaintiff was exposed. (See Docket No. 201, Instruction Nos. 48–53.)

■ Second, Westfield Gage asserts that the last sentence of Instruction No. 39 incorrectly informed the jury that, if they found the prima facie case of gender discrimination insufficient, they should proceed to the third step of the burden-shifting analysis.[28] Viewed in isolation, the last sentence of Instruction No. 39 might be read to imply, incorrectly, that if there is no prima facie case, the jury (instead of finding in Westfield Gage's favor) should move to the third step of the analysis. However, the instructions, read as a whole, appropriately lay out the proper test. *See United States v. Woodward,* 149 F.3d 46, 69 (1st Cir.1998) (noting that the court has "considerable latitude" in charging the jury so long as the charge as a whole

adequately sets forth the law "applicable to the controlling issues").

For example, Instruction No. 36 makes clear that it is Plaintiff's burden to make out a prima facie case of discrimination. Instruction No. 37, in turn, directs that the jury need only consider the second step in the analysis if Plaintiff establishes her prima facie case. Only after the jury wends its way past Instruction No. 38, relating to Westfield Gage's articulation of a non-discriminatory reason for the adverse actions experienced by Plaintiff, does it find itself at the now-challenged Instruction No. 39. At that point, the court instructed the jury, properly in its estimation, that if Westfield Gage had not articulated a non-discriminatory reason for an adverse action, then the jury could consider whether the elements of Plaintiff's prima facie case—which at that point would have been established—were enough to enable her to prevail on her gender discrimination claim. If not, the jury was to consider all the other evidence to determine whether or not Plaintiff could prevail (Instruction No. 40). All these instructions, it must be remembered, came against the background of other directives that Plaintiff bore the ultimate burden of proof. (See, e.g., Instruction Nos. 31 and 32.) In context, therefore, the last sentence of Instruction No.

---

27. Westfield Gage proffered a single instruction in which the term "clean language" was used. In pertinent part, it stated as follows: "The Massachusetts courts have noted that Title VII is not a clean language act, and that the Massachusetts Anti–Discrimination statutes do not mandate clean language in the workplace. *Prader v. Leading Edge Products, Inc.,* 39 Mass.App.Ct. 616, 619–620, 659 N.E.2d 756 (1996)." (Docket No. 156 ¶ 6.)

28. In whole, Instruction No. 39 stated as follows:
 If you find that Westfield Gage *has* articulated a non-discriminatory reason for a particular action, you should move to the third and final step of your analysis. If, however,

you find that Westfield Gage has *not* articulated a non-discriminatory reason for an adverse action taken towards Plaintiff, then you may consider whether the elements of Plaintiff's prima facie case, are enough to prevail on her gender discrimination claim with respect to that action. Remember, the ultimate issue is whether Plaintiff has proven, by a preponderance of the evidence, that Westfield Gage intentionally discriminated against her because of her gender. If you find the prima facie case insufficient in this regard, then you should move to the third and final step.
 (Docket No. 201, Instruction No. 39.)

39 was not so unclear as to justify a new trial.

■ Third, Westfield Gage submits that the court's failure to instruct the jury as to the meaning of Plaintiff's "at-will" employment status was particularly prejudicial with respect to the gender discrimination award. The court agrees with Plaintiff, however, that there was no prejudicial error since it repeatedly and consistently instructed the jury that Plaintiff at all times carried the burden of proof that her treatment was motivated by discriminatory animus. If the jury, as it appears, felt that Westfield Gage constructively discharged Plaintiff for an illegal purpose, then it makes no difference that they could have fired her for anything short of using illegal means simply because she was an at-will employee.

### c. *Alleged Excessiveness of Damages— Remittitur*

Finally, Westfield Gage contends that a new trial is warranted on both the sexual harassment charges and the gender discrimination claim because of excessive damages. With respect to both claims, Westfield Gage also seeks a remittitur. The court addresses each contention in turn.

#### (i) sexual harassment damages

■ Westfield Gage argues that "emotional" damages of $250,000 on Plaintiff's sexual harassment claims are "grossly inflated." In so arguing, Westfield Gage points to the fact that Woodis was found liable for only a fraction (one-tenth) of

what Westfield Gage was ordered to pay for sexual harassment as well as the alleged paucity of medical evidence with respect to Plaintiff's emotional distress.

The court does not believe that the $250,000 emotional damages figure, while high, is so excessive as to justify either a new trial on Plaintiff's sexual harassment claims or a remittitur. As detailed above, the hostile environment to which Plaintiff was exposed could have been found by the jury to be severe and pervasive. In addition, there was evidence that, because of the harassment, Plaintiff stopped eating, slept more, began losing both weight and hair, and bit her nails until they bled. Dr. Price, an expert psychiatrist, also testified to Plaintiff's significant workplace distress and opined that she suffered from major depression.

*Koster v. Trans World Airlines, Inc.,* 181 F.3d 24 (1st Cir.1999), a case cited by Westfield Gage, actually supports Plaintiff's emotional damages award. Granted, the First Circuit held that $716,000 for emotional distress was excessive in an age discrimination action where the plaintiff was unlawfully furloughed after twenty-five years of service. *Id.* at 35–36. Nonetheless, the court allowed a maximum recovery of $250,000, the same figure at issue here, because the plaintiff suffered emotionally after his furlough, e.g., he had trouble sleeping, was anxious, took antacid pills and his family life suffered. *See id.* Moreover, the court recognized that the $250,000 award was subject to a discretionary multiplier under state law. *See id.* at 36 n. 5.[29]

---

**29.** Other age or handicap discrimination cases cited in *Koster* also support Plaintiff's award, albeit not universally. *See, e.g., Westinghouse Elec. Supply Corp. v. MCAD,* 1999 WL 140492, at *3, 10–11 (Mass.Super. Mar. 5, 1999) (upholding $250,000 emotional distress award where unlawfully fired worker suffered from depression, insomnia, constant

diarrhea and stomach pain); *Powers v. H.B. Smith Co.,* 42 Mass.App.Ct. 657, 679 N.E.2d 252, 254 (1997) (allowing reduced damage award for $350,000 for front pay and emotional distress); *but see Kelley v. Airborne Freight Corp.,* 140 F.3d 335, 345 (1st Cir. 1998) (emotional distress damages reduced from $250,000 to $150,000, albeit subject to

In the area of sexual harassment, the First Circuit recently held that an emotional distress award of $275,000 was not excessive. *O'Rourke v. City of Providence*, 235 F.3d 713, 734 (1st Cir.2001). In part, the court relied on a decision from the District Court for the District of Columbia, not unlike the case at bar, which affirmed a $225,000 award for emotional distress arising from sexual harassment. *See id.* (citing *Webb v. Hyman*, 861 F.Supp. 1094, 1116 (D.D.C.1994)). *See also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1075 (10th Cir.1998) (affirming $200,000 emotional distress award in sexual harassment case); *Smith v. Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416–17 (10th Cir.1997) (upholding $200,000 sexual harassment-emotional distress award which was reduced from $270,000 because of statutory damage caps). As the court stated in *O'Rourke:* "A jury's award of damages stands unless it is grossly excessive or shocking to the conscience." *Id.*, 235 F.3d at 733 (citation and internal quotation marks omitted). Here, the jury's $250,000 emotional damages award for sexual harassment is neither.[30]

The court also rejects Westfield Gage's contention that the $250,000 verdict was excessive when compared to the $25,000 assessed against Woodis, whom Westfield

Gage describes as Plaintiff's "primary antagonist." It is simply not true, as Westfield Gage asserted in its initial memorandum, that, if Woodis' conduct were excluded, "there is insufficient remaining evidence to support a finding of 'serious and pervasive' sexual harassment" by other Westfield Gage employees. (Docket No. 214 at 7.) As detailed above, a number of Westfield Gage employees, other than Woodis, subjected Plaintiff to a variety of sexually explicit materials and hostile language. It is quite reasonable to assume that the jury sought to hold Westfield Gage responsible for all of the sexual harassment occurring on its premises—or at least the non-Woodis harassment—and Woodis responsible for the harassment that he alone inflicted. The court does not intend to second guess that allocation.

Finally, the alleged paucity of medical evidence undergirding Plaintiff's emotional injuries is of little moment. As the *Smith* court observed, the testimony of a treating physician in a sexual harassment case "is *one* suggested method of proving emotional damages *but is not the sole dispositive requirement.*" *Id.*, 129 F.3d at 1417 (emphasis added) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (in turn holding

state-law multiplier); *Labonte v. Hutchins & Wheeler,* 424 Mass. 813, 678 N.E.2d 853, 861–62 (1997) (finding $550,000 emotional distress excessive where depressed employee had not been hospitalized, took no anti-depression medication and his depression soon abated).

**30.** Although Westfield Gage's memorandum in support of its new trial motion alluded to a Title VII damage cap (see Docket No. 214 at 25–27), it appears that Westfield Gage, wisely, abandoned such a line of argument by not pursuing such in its reply memorandum. As Westfield Gage observes: "The emotional distress damages were awarded under [both] a Title VII claim and under Massachusetts law"

and "there is no statutory cap governing the damages under state law" (*id.* at 27). *See also Lindsay v. Future Electronics Corp.,* 930 F.Supp. 677, 679 (D.Mass.1996) (finding "persuasive" reasoning that chapter 151B, unlike certain federal ani-discrimination provisions, does not limit the amount of compensatory damages). In this vein, it is telling that neither Westfield Gage's proposed jury instructions nor its proposed verdict form requested that Plaintiff's Title VII sexual harassment claim be separated from her chapter 151B sexual harassment claim or that a damage cap should apply. (See Docket Nos. 156 and 193.)

that proof of psychological harm is one relevant factor but is not required)). Here, in a similar fashion, "[c]onsidering the cumulative evidence of Plaintiff's emotional harm, the absence of testimony by a treating physician does not ... mean her claim is devoid of substance." *Id.* And, unlike in *Smith,* here there was corroborating testimony by an expert witness, Dr. Price. *See* 73 Am.Jur. TRIALS 1, *Sexual Harassment Damages and Remedies,* § 29 (observing that "the plaintiff's testimony about her emotional injuries"—when coupled with corroborating evidence—"may be sufficient to support an award of compensatory damages" particularly where there is "supporting ... expert witness testimony"). In short, the jury's award of $250,000 in emotional damages for the sexual harassment claims against Westfield Gage will stand.

(ii) gender discrimination damages

■ Westfield Gage also argues that the $750,000 in "economic" damages for gender discrimination represents an overly-excessive "front pay" award warranting either a new trial on this claim or a substantial remittitur. The award of twenty-eight years of front pay, Westfield Gage asserts, is unduly speculative and does not consider Plaintiff's failure to mitigate her damages. The court, for the most part, agrees.

Preliminarily, the court notes that, unlike Plaintiff's sexual harassment charges which arose under both state and federal law, the gender discrimination claim was based solely on Title VII. In addition, the court notes that the jury awarded no emotional damages on the gender discrimination claim. The court also assumes, as Westfield Gage asserts, that the jury likely intended all of its $750,000 gender discrimination-economic damages award as "front

pay" under Dr. McCausland's definition, i.e., the amount of wages and benefits Plaintiff would have received had she remained at Westfield Gage from the beginning of trial until retirement. The court makes this assumption given Dr. McCausland's emphasis on elevated levels of front pay and the lack of evidence as to other economic damages with respect to this claim.[31]

■ Front pay awards are targeted at compensating the plaintiff from the conclusion of trial until she can obtain comparable employment elsewhere. *Selgas v. Am. Airlines, Inc.,* 104 F.3d 9, 12 (1st Cir.1997). However, "the court is not supposed to 'catapult [the plaintiff] into a better position than [she] would have enjoyed in the absence of discrimination.'" *Denton v. Boilermakers Local 29,* 673 F.Supp. 37, 51 (D.Mass.1987) (quoting *Ford Motor Co. v. EEOC,* 458 U.S. 219, 234, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982)). Since future damages are inherently speculative, the court must keep a close eye on the circumstances of the particular case. *See id.; Martineau v. City of Concord,* 1994 WL 587832, at *1 (D.N.H. Oct.24, 1994). *See also Lussier v. Runyon,* 50 F.3d 1103, 1108 (1st Cir.1995) (noting "that the decision to award or withhold front pay ... is within the equitable discretion of the trial court").

Although front pay is not subject to a federal statutory damage cap, *see Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 848, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001), the First Circuit has expressed serious concern about speculative and excessively lengthy front pay awards under federal law. *See Selgas,* 104 F.3d at 13–14 (finding eighteen month front pay award and noting that "front pay is an alternative

---

31. In this vein, it must be remembered that the jury calculated separate economic dam-

ages when it rendered an $8,140 verdict in the FEPA claim.

for *finite* periods during which reinstatement is unavailable") (emphasis added). Recently, the court cautioned as follows:

An award of front pay that extends over many years to an estimated retirement date should be examined carefully ... since "the greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably be attributed to the illegal conduct of the employer."

*Cummings v. Standard Register Co.*, 265 F.3d 56, 66 (1st Cir.2001) (quoting *Conway v. Electro Switch Corp.*, 402 Mass. 385, 523 N.E.2d 255, 257 (1988)). To be sure, the court in *Cummings* upheld a $665,000 award which constituted fourteen years of front pay. *Id.* But that age discrimination case was based solely on an "open-ended" state law and the court expressed "grave doubts as to the sustainability of a front pay award of so great a duration" under federal law. *Id.* Moreover, in contrast to the facts here, the plaintiff in *Cummings* was a fifty-five year old manager with fifteen years of experience at the company and an annual salary at termination of over $88,000. *See id.* at 60–61. *See also Criado v. IBM Corp.*, 145 F.3d 437, 445 (1st Cir.1998) (limiting front pay award to six months); *Denton*, 673 F.Supp. at 51 (denying lifetime front pay under Title VII since it would "unjustly enrich" the plaintiff).

The First Circuit is not alone in its concern for avoiding excessive front pay awards. As Westfield Gage notes, the importance of the court's scrutiny of front pay awards is underscored by the fact that many jurisdictions do not allow juries to make front pay awards, leaving that task to the judge. *See, e.g., E.E.O.C. v. W & O, Inc.*, 213 F.3d 600, 618–19 (11th Cir.2000);

*McCue v. Kansas*, 165 F.3d 784, 791 (10th Cir.1999); *Reiner v. Family Ford, Inc.*, 146 F.Supp.2d 1279, 1281 (M.D.Fla.2001). In this regard, *Peyton v. DiMario*, 287 F.3d 1121 (D.C.Cir.2002), a recent decision from the District of Columbia Circuit cited by Westfield Gage in a supplemental memorandum which has many parallels to the one at bar, is particularly instructive.

In *Peyton*, the D.C. Circuit vacated the trial court's award of twenty-six years of front pay to a thirty-four year old former employee. *Id.*, 287 F.3d at 1128–29. The plaintiff, who had worked for the defendant for eleven years, was harassed, threatened and eventually fired after filing a formal complaint about a supervisor's lewd comments and gestures. *Id.* at 1123–24. The jury found in the plaintiff's favor on her discrimination claim, awarded compensatory damages, and, sitting in an advisory capacity, recommended a front pay award of $840,000. *Id.* at 1124. The trial court reduced the amount of front pay to $377,615, which it calculated by multiplying the loss of the plaintiff's earnings from the date of trial through her projected retirement at age sixty, some twenty-six years. *Id.* at 1125.

On appeal, the D.C. Circuit held that even the trial court's reduced award was unduly speculative, an abuse of discretion, and resulted in a tremendous, unjustified "windfall" to the plaintiff. *See id.* at 1128–30. Recognizing that "[t]he longer a proposed front pay period, the more speculative the damages become," the court found that the plaintiff did not provide, as she must, "the essential data necessary to calculate a reasonably certain front pay award." *Id.* at 1128–29 (citations and internal quotation marks omitted). In particular, the court found that the plaintiff failed to provide sufficient evidence that she was unable to pursue higher paying jobs in the future and that her subjective

intent to remain in the defendant's employ until retirement did not entitle her to front pay for the remainder of her work life. *Id.* at 1129. Moreover, the court observed, "other courts seem to agree that plaintiffs in their forties [let alone their thirties] are too young for lifetime front pay awards." *Id.* at 1130 (citing cases).

Here, too, the court believes it appropriate to reduce the front pay damages awarded Plaintiff. First and foremost, a twenty-eight year front pay award, given the circumstances of this case, is unjustifiably long. Unlike *Handrahan v. Red Roof Inns, Inc.*, 43 Mass.App.Ct. 13, 680 N.E.2d 568, 575 (1997) (remitting $600,000 front pay award to $488,000 even though the plaintiff suffered a serious disability and thus would be unable to work full-time), and other cases cited by Plaintiff, "there is no evidence that [P]laintiff was not able to work; indeed [P]laintiff sought and found employment." (Docket No. 225 at 39.)[32]

To be sure, the court had some reservations about allowing Plaintiff's economic expert, Dr. McCausland, to testify with respect to twenty-eight years of front pay. (See Tr. Vol. IV at 167–68.) Westfield Gage, however, never offered the court an alternative length of time for an appropriate front pay calculation. (See *id.* at 145.) Therefore, the court allowed the admission of Dr. McCausland's testimony and exhibits without substantial limitation. Still, the bottom line figure of $750,000 found by the jury is, in the court's opinion, just too high.[33]

In the court's view, the $750,000 economic damages award with respect to Plaintiff's gender discrimination claim circumvents Title VII's "make-whole" policies and creates a windfall for Plaintiff. The award either "exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before the jury," *Eastern Mtn. Platform Tennis, Inc. v. Sherwin–Williams Co.*, 40 F.3d 492, 502 (1st Cir.1994), or is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand," *Blinzler v. Marriott Intern., Inc.*, 81 F.3d 1148, 1161 (1st Cir.1996). Accordingly, the court will grant Westfield Gage a new trial on this claim—and this claim alone—unless Plaintiff agrees to substantially remit the $750,000 verdict. *See Conjugal Partnership Re Jones & Jones v. Conjugal Partnership Re Pineda & Pineda*, 22 F.3d 391, 397 (1st Cir.1994) (noting that court "may ... condition the denial of a motion for a new trial on the filing by plaintiff of a remittitur in a stated amount") (citations,

---

**32.** *Handrahan* was a disability discrimination case. Westfield Gage argues that courts are more likely to allow larger front pay awards in cases involving disability or age discrimination than those involving gender discrimination. While there appears to be some support for Westfield Gage's theory—*compare Handrahan* and *Cummings,* 265 F.3d at 67 (fourteen years of front pay awarded for age discrimination under state law), *with Conway,* 523 N.E.2d at 257 (referring to what appears to be trial court's award of around five years front pay for sex discrimination), and *Peyton,* 287 F.3d at 1130 (vacating twenty-six year front pay award in sex discrimination case)—the court does not base its decision on that distinction. Rather, the court believes that a reduction is warranted principally because of the excessive length of the front pay award.

**33.** In this vein, it is noted that Plaintiff's job at Westfield Gage paid $10 per hour or approximately $21,000 per year. With overtime and bonuses, Plaintiff earned about $30,000 per year. Dr. McCausland's testimony, which placed Plaintiff's front pay loss in the range of $573,638 to $833,169, was apparently based on the tenuous assumption that Plaintiff—working as a waitress and earning less than minimum wage—was doing the best that she could and that her wages until retirement would not exceed her current annual rate of $10,000, except as adjusted by inflation.

ellipses and internal quotation marks omitted).

 Although neither side has briefed the issue as to the appropriate amount of remittitur, "[t]he rule in this circuit for computing a remittitur is the least intrusive standard." *Conjugal Partnership*, 22 F.3d at 398 (citation and internal quotation marks omitted). *See also Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir.1990) (explaining three different rules for computing remittitur and adopting the least intrusive method). Thus, "the remittitur amount should reduce the verdict 'only to the maximum that would be upheld by the trial court as not excessive.'" *Id.* (quoting *Earl*, 917 F.2d at 1330).

In the court's view, only one-fourth of the $750,000 award, representing seven years of front pay, should remain. First, Plaintiff cites no decision in which anything approaching twenty-eight years of front pay was awarded to a young, healthy worker such as Plaintiff who was subjected to gender discrimination, particularly one who worked for her employer for only four years. Second, the First Circuit, as indicated, has expressed "grave doubts" whether even a fourteen year front pay award would be appropriate under federal law in an age discrimination case brought by a highly-paid manager who had been with the company for fifteen years. *Cummings*, 265 F.3d at 66. Third, the awards for cases such as this correlate to mere months or a few years of front pay, i.e., the period from the conclusion of trial until the plaintiff can obtain comparable employment elsewhere. *See Selgas*, 104 F.3d at 12. *See also Criado*, 145 F.3d at 445.

In sum, the court will condone a front pay award of seven years only. Giving Plaintiff the benefit of the doubt under the least intrusive standard, the court will make no further deduction to account for what Westfield Gage describes as inadequate mitigation. Accordingly, the court will grant Westfield Gage a new trial on the gender discrimination claim, unless Plaintiff agrees to remit her award on that claim to $187,500 (one-fourth of $750,000). Should Plaintiff agree to a new trial on that claim, she will only be allowed to seek front-pay economic damages from Westfield Gage, the court accepting the jury's findings that Plaintiff is not entitled to emotional damages for any gender discrimination. *See* Fed.R.Civ.P. 59(a) ("new trial may be granted to ... any of the parties and on ... part of the issues").

### (d) *Remaining Arguments*

In its initial memorandum in support of its new trial motion, Westfield Gage raised a number of additional "concerns" which, for whatever reason, were not pursued in its detailed reply brief filed by new counsel. Since most of these issues are unsupported by case law and since all, in the court's view, are without merit—or at least are not significant enough to justify a new trial—the court will address them in summary fashion.

First, Westfield Gage argues that "the court erred in refusing to instruct the jury that Westfield Gage had to have reason to know that workplace profanity and vulgarity was unwelcome in order to find against Westfield Gage on the [*Faragher–Ellerth* ] affirmative defense." (Docket No. 214 at 3–4.) The court, however, instructed the jury extensively on the "unwelcomeness" standard (Docket No. 201, Instruction Nos. 48–52) and, as detailed above, precisely described the *Faragher–Ellerth* affirmative defense (*id.*, Instruction Nos. 57–59). In the court's view, no more was needed.

 Second, Westfield Gage complains that the court should have admitted two types of evidence about Plaintiff's conduct prior to her employment at Westfield

Gage: (1) certain medical records with respect to her drug and alcohol use in "1991" and "1993"; and (2) testimony that, "sometime in 1993," again before she worked at Westfield Gage, Plaintiff "lifted her shirt exposing her breasts." (Docket No. 214 at 4–6, 20–21.) Both categories of evidence, were deemed, and in the court's opinion remain, either irrelevant or unduly prejudicial. *See* Fed.R.Evid. 401–403.[34]

Third, Westfield Gage asserts that the court should have defined the term "constructive discharge" in the exact way Westfield Gage suggested. The court's constructive discharge instruction virtually mimicked First Circuit language, compare, e.g., Instruction No. 35 with *Serrano–Cruz*, 109 F.3d at 26, and *Calhoun*, 798 F.2d at 561, and provides no basis for a new trial. *See Joia v. Jo–Ja Serv. Corp.*, 817 F.2d 908, 912 (1st Cir.1987) ("[I]f the district court's instruction properly apprises the jury of the applicable law, the failure to give the exact instruction requested does not prejudice the objecting party.").

Fourth, Westfield Gage claims that several gender discrimination jury instructions (see, e.g., Docket No. 201, Instruction

Nos. 36, 39, 40, 41 and 80) as well as special verdict questions with respect to that claim were improper, confusing and erroneous. The court disagrees. In the court's view, the instructions, taken as a whole, laid out the proper test for gender discrimination. As described, the *McDonnell Douglas* framework was tracked and the instructions on damages were appropriate.

■ Fifth, Westfield Gage contends that Cuipylo "improperly challenged and initiated a dispute with Filios in the presence of the jury" and that such conduct was "severely prejudicial." (Docket No. 214 at 21.) The alleged "dispute" occurred as counsel was leaving a sidebar conference during the cross examination of Plaintiff. There is no transcript of what was actually said between Cuipylo and Filios, but it apparently boiled down to the following; Filios stared at Cuipylo who then "asked him if there was something he wanted" to which Filios replied, "You asked me something." (Tr. Vol. II at 145–46.)[35] In the court's view, this brief exchange, assuming any juror even heard it, is insufficient to warrant a new trial.

---

34. Conversely, Westfield Gage's argument to the contrary, the court deemed relevant to Plaintiff's FEPA claim, and otherwise admissible, certain testimony and exhibits regarding "new hires" between 1994 and 1998, the years of Plaintiff's employment at Westfield Gage.

35. Specifically, the following colloquy ensued after the jury was excused:
THE COURT: What's happening? Please talk with your clients and then I'll hear from you.
(Pause.)
THE COURT: What's happening here? This is not something that ought to be done in front of the jury. What's going on?
MS. CUIPYLO: I'm sorry, your Honor. As I was coming back here, Mr. Filios was staring at me, and I asked him if there was something he wanted to say to me.

THE COURT: And what was the reply to this?
MR. RYAN: I believe his reply was, "You asked me something." He didn't say anything.
MS. CUIPYLO: I'm sorry, your Honor.
THE COURT: I'm going to tell you both you ought not to have used that as an opportunity to confront. If there was an issue about that, if you felt there was some kind of behavior on his part that was not appropriate, then you should bring that to my attention in some manner, but not in the way that you mentioned it at this particular point, and Mr. Filios you need to know better to respond verbally to that, and please deal with all matters through your attorney. We'll take a five-minute break.
(Tr. Vol. II at 145–46.)

■ Sixth and finally, Westfield Gage argues that the court erred in prohibiting its attorney from reading three of Plaintiff's interrogatory answers into evidence at the close of its case for "impeachment purposes." (Docket No. 243 (Tr. Vol.IX) at 12.) The court has "wide latitude" to reasonably control the presentation of testimony "in order to avoid prejudice, confusion, and unnecessary waste of time." *United States v. Malik*, 928 F.2d 17, 19–20 (1st Cir.1991) (citing cases). Westfield Gage's request to impeach Plaintiff with her interrogatory answers came more than one week after she had been extensively cross-examined on the very subject at issue, whether she herself had engaged in on-the-job sexual conduct. (See Tr. Vol. II at 98–179; Tr. Vol. III at 120–37; Tr. Vol. IX 11–13.) The court believes that its decision to exclude this last-minute, cumulative evidence was well within its discretion.

## C. *WOODIS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL*

In his remaining motion, Woodis seeks judgment as a matter of law with respect to the sexual harassment claim targeting him, or, in the alternative, a new trial. Given the court's conclusion that there exists an enforceable settlement of that claim, Woodis' motion will be denied as moot.

Even if not moot, the court would deny Woodis' motion on its merits. The first of Woodis' three arguments—that he lacked notice of the MCAD proceedings and an opportunity to participate and conciliate at the administrative level—has been rejected by the court several times: in the context of Woodis' motion to dismiss, *see Horney*, 95 F.Supp.2d at 36, at summary judgment, (Docket No. 150 at 9–11), and during trial, (Docket Nos. 190 and 198). Woodis' second argument—that the sexual harassment verdict questions should have

specified each element of the claim—is, in the court's estimation, misplaced. Woodis offers no authority for this novel proposition and, in fact, concedes that "[t]he Court's instructions to the jury contained a correct description of the Plaintiff's burden of proof with respect to her sexual harassment claim." (Docket No. 209 at 4.) As to Woodis' third argument that the jury should have been asked to determine the MCAD issues, the court, as indicated, previously resolved that issue against him as a matter of law and maintains its reasoning at this time as well.

## III. *CONCLUSION*

For the foregoing reasons, the court hereby orders as follows:

(1) Plaintiff's motion to enforce her settlement agreement with Woodis (Docket No. 218) is ALLOWED;

(2) Woodis' motion that Westfield Gage be ordered to pay the $25,000 settlement amount (included in Docket No. 221) is DENIED;

(3) Westfield Gage's motion for judgment notwithstanding the verdict (Docket No. 210) is DENIED;

(4) Westfield Gage's motion for a new trial or remittitur (Docket No. 212) is ALLOWED insofar as Westfield Gage will be granted a new trial on Plaintiff's gender discrimination claim unless Plaintiff agrees to remit the $750,000 damages found by the jury on that claim to $187,500, but is otherwise DENIED; and

(5) Woodis' motion for judgment as a matter of law or for a new trial (Docket No. 209) is DENIED.

With regard to (4), Plaintiff has fifteen days from this order to make her election.

IT IS SO ORDERED.